**UNITED STATES of America,
Plaintiff,**

v.

**Brent CROXFORD, Defendant.**

**No. 2:02–CR–00302–PGC.**

United States District Court,
D. Utah,
Central Division.

July 7, 2004.

---

**33.** *Jenkins,* 713 F.2d at 251.

Michele M. Christiansen, Esq., U.S. Attorney's Office, Robert L. Steele, Esq., Office of the Guardian AD Litem, Salt Lake City, UT, for Plaintiff.

David V. Finlayson, Esq., Salt Lake City, UT, for Plaintiff.

## AMENDED MEMORANDUM OPINION AND ORDER FINDING APPLICATION OF THE FEDERAL SENTENCING GUIDELINES UNCONSTITUTIONAL

CASSELL, District Judge.

Defendant Brent Croxford is before the court for sentencing on the offense of sexual exploitation of a child in violation of 18 U.S.C. § 2251(a). For more than fifteen years, sentencings such as Croxford's have been governed by the federal sentencing guidelines. Last Thursday, however, the United States Supreme Court ruled that portions of the State of Washington's sentencing guidelines were unconstitutional. The Court held that Washington's guidelines scheme deprived a defendant of his Sixth Amendment right to a jury trial by increasing his presumptive sentence based on a judge's, rather than a jury's, factual findings regarding sentencing factors. Because the federal sentencing guidelines suffer from the same constitutional infirmity, the court holds that, as applied to this case, the federal sentencing guidelines are unconstitutional and cannot govern defendant Croxford's sentencing. Because of the potentially cataclysmic implications of such a holding, the reasoning underlying this conclusion will be set out at some length.

### I. FACTUAL BACKGROUND

On November 21, 2001, a case worker, Lori Thomassen, from the Division of

Family Services called detective Craig Ellertson of the South Jordan Police Department. Thomassen advised Ellertson that a young girl, who the court will refer to as "C.C.," had disclosed that her adoptive father was taking inappropriate photographs of her.[1] At the time of the hearing, C.C. was approximately eight or nine years old.[2] Shortly after this telephone conversation, Ellertson, along with Thomassen and another officer, went over to the Croxford residence to investigate the matter. Upon arriving at the Croxfords, Mr. and Mrs. Croxford granted Ellertson and Thomassen permission to interview C.C. alone.[3]

During the interview, C.C. told Ellertson and Thomassen that Croxford was taking nude photos of her with a digital camera. C.C. described the sexually explicit poses and the things that Croxford, her adoptive father asked her to do in the photographs.[4] C.C. also explained that she thought that Croxford was putting them on the Internet and that she thought Croxford had taken similar photos of another young girl who had previously been a foster child in the Croxford home.[5]

After Ellertson and Thomassen had interviewed C.C., Ellertson requested that Croxford accompany him to the police station for questioning. During an interview with Ellertson, Croxford explained that he had taken "bathtub" photographs of C.C.[6] Croxford also confirmed that he owned a Sony digital camera, was an Internet provider for certain customers, and that he repaired and worked on computers in his home. At the conclusion of the interview, in response to questions about taking sexually explicit pictures of C.C., Croxford did not deny that he had taken such pictures, and stated "I meant to delete all of those" and "You should take me out and shoot me."[7]

Ellertson obtained a search warrant for Croxford's home. During the execution of the search warrant, officers discovered several computer diskettes in a file cabinet which contained sexually explicit pictures of C.C.[8] Upon examination of Croxford's computer equipment it was discovered that Croxford had downloaded thousands of pornographic images, including child pornography.[9] It was further discovered that the defendant had DVD disks containing photographs of C.C. and a previous foster child of the defendant, "A.M.," posing in lewd positions.

On May 16, 2002, a federal grand jury returned a two-count indictment against Croxford. Count I charged sexual exploitation of a minor, in violation of 18 U.S.C. § 2251(a). Count II charged possession of child pornography, in violation of 18 U.S.C. § 2252A(a)(5)(B). The defendant was arraigned on May 30, and thereafter filed a motion to suppress the evidence against him. Following an evidentiary hearing and additional time for briefing requested by the parties, the court denied the motion to suppress in a memorandum decision on October 10, 2002. Thereafter, the defendant requested additional time in which to

---

1. See Transcript of Hearing on Motion to Suppress, August 8 and 9, 2002 at 8 ("Transcript").

2. See id. at 12.

3. See id. at 9–11.

4. See id. at 12–13.

5. See id. at 13–14.

6. Transcript at 20.

7. Id. at 20–21.

8. See id. at 26.

9. See Government's Memorandum in Opposition to Defendant's Motion to Dismiss at 4.

consider entering a guilty plea and to file additional motions challenging the indictment. Because a guilty plea would avoid the need for C.C. to testify, the court granted the additional time and set a new trial date of April 23, 2003. However, shortly before the trial was to begin, the court was notified by the probation office that the defendant had disappeared. On April 7, 2003, the court issued a warrant for the defendant's arrest. On April 15, 2003, the defendant was found in Knoxville, Tennessee, after an apparent suicide attempt. The defendant was placed in U.S. Marshal custody and transferred back to the District of Utah.

On May 16, 2003, based on the suicide attempt, the court ordered a psychological and psychiatric examination. The defendant was then transferred to Springville, Missouri, where he was detained until December 17, 2003. The psychiatric examination concluded that the defendant was competent to stand trial. After his return to Utah, on February 25, 2004, the defendant entered into a plea agreement with the government, pleading guilty to Count I of the indictment while Count II was dismissed. The parties apparently contemplated that Croxford's sentence would fall within a Guidelines range of 121 to 151 months. In the agreement, the government specifically agreed not to argue for any upward departures from the applicable Guideline range.

The probation office then prepared a pre-sentence report in the matter, including calculations under the federal sentencing guidelines. This court noticed that missing from the pre-sentence report was a recommendation for a two-level enhancement for obstruction of justice based upon Croxford's fleeing of the jurisdiction short-

ly before trial. After an amendment which added the obstruction of justice enhancement, the final pre-sentence report concluded that the defendant should be sentenced under the Guidelines at an offense level of 34 and a criminal history of I, which produces a Guidelines sentence of between 151–188 months.

The probation office arrived at this conclusion in four steps. First, the office calculated the guidelines for the sexual exploitation of the victim identified in the indictment: C.C. The base offense level for this offense was 27, increased by four levels because the victim was under the age of twelve, increased a further two levels because the defendant was a parent, relative, or legal guardian of the victim, and increased a further two levels because the defendant obstructed justice by absconding before trial.[10] This produced a total adjusted offense level of 35.

As a second step, the office calculated guidelines for another young victim the defendant had photographed: A.M. Although the defendant had not been charged in the indictment with exploiting A.M., his victimization of her was part of the "relevant conduct" for determining his sentencing guideline, as it was part of his common scheme or plan.[11] The guidelines calculation for the exploitation of A.M. was exactly the same as for C.C.—base offense level of 27, increased by four levels because the victim was under the age of 12, increased by a further two levels because the defendant was a parent, relative, or legal guardian of the minor, and finally increased by a further 2 levels for obstruction of justice. This produced a total adjusted offense level of 35.

As the next step, the probation office applied the "grouping rules" for aggregat-

---

**10.** *See* U.S.S.G. §§ 2G2.1, 3C1.1.

**11.** *See generally* U.S.S.G. § 1B1.3 (describing relevant conduct); *see also* U.S.S.G.

§ 2G2.1(c)(1) (requiring consideration of multiple victims when sentencing for sexual exploitation of a minor).

ing these two separate calculations. Under the applicable grouping rules,[12] the two separate victims produced two "units" of victimization, which requires an additional two-level enhancement above the highest base offense level previously calculated—the level 35 was increased to a level 37.

As a final step, the defendant was given credit for accepting responsibility for his offense, producing a reduction of three levels to a level 34. Because the defendant had no prior criminal history, his sentencing guideline range is 151 to 188 months.

However, five days before sentencing, the United States Supreme Court struck down Washington's sentencing guidelines in *Blakely v. Washington*.[13] The defendant now argues that *Blakely* requires the same fate for the federal sentencing guidelines—at least as to the two enhancements at issue in this case. This court reluctantly agrees.

## II. UNITED STATES V. BLAKELY.

In *Blakely v. Washington*, the Supreme Court struck down the Washington State sentencing guideline scheme *Blakely* is the third in a line of cases that have cast serious doubts on the constitutionality of the federal sentencing guidelines. In the first of these cases, *Apprendi v. New Jersey*,[14] the Supreme Court struck down a New Jersey sentencing statute that allowed a judge to enhance a defendant's sentence based on the judge's finding that the crime was committed with a biased

purpose. The holding of *Apprendi* was that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." [15] This holding was based on the Court's understanding of the Due Process Clause and the Sixth Amendment's right to trial by jury. "These rights," the Court reasoned, "indisputably entitle a criminal defendant to 'a jury determination that [he] is guilty of every element of the crime with which he is charged beyond a reasonable doubt.' " [16] The Court further ruled that a legislature's labeling of something as a "sentencing factor" rather than an "element" of the crime was not dispositive. "[W]hen the term 'sentence enhancement' is used to describe an increase beyond the maximum authorized statutory sentence, it is the functional equivalent of an element of a greater offense than the one covered by the jury's guilty verdict," and therefore must be submitted to the jury.[17]

The majority in *Apprendi* explicitly reserved the question of the impact of its ruling on the federal guidelines.[18] However, Justice O'Connor's dissent, joined by Chief Justice Rehnquist and Justices Kennedy and Breyer, questioned the impact of the holding on guidelines schemes, including the federal guidelines. "[T]he Court does not say," Justice O'Connor wrote, "whether these schemes are constitutional, but its reasoning strongly suggests that they are not." [19] O'Connor suggested that

12. *See* U.S.S.G. 2G2.1(c)(1) (requiring application of § 3D1.2).

13. —— U.S. ——, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004).

14. 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000).

15. *Id.* at 490, 120 S.Ct. 2348.

16. *Id.* at 477, 120 S.Ct. 2348 (citations omitted).

17. *Id.* at 494 n. 19, 120 S.Ct. 2348.

18. *Id.* at 497 n. 21, 120 S.Ct. 2348 ("The Guidelines are, of course, not before the Court. We therefore express no view on the subject beyond what this Court has already held.").

19. *Id.* at 550–51, 120 S.Ct. 2348 (O'Connor J. dissenting).

after *Apprendi* sentences based on guidelines schemes "will rest on shaky ground."[20]

The federal sentencing guidelines were again called into question by the holding in *Ring v. Arizona.*[21] In that case, a jury found the defendant guilty of first-degree murder. Under the Arizona law in question, the maximum punishment was life in prison unless the judge made a finding that an aggravating factor was involved, in which case the death penalty could be applied. The Court struck down the statute based on its reasoning in *Apprendi.*

> If a State makes an increase in a defendant's authorized punishment contingent on the finding of a fact, that fact—no matter how the State labels it—must be found by a jury beyond a reasonable doubt .... A defendant may not be "expose[d] ... to a penalty *exceeding* the maximum he would receive if punished according to the facts reflected in the jury verdict alone."[22]

The Court held that "[b]ecause Arizona's enumerated aggravating factors operate as the 'functional equivalent of an element of a greater offense,' ... the Sixth Amendment requires that they be found by a jury."[23]

Following *Apprendi* and *Ring*, commentators began to question whether the federal sentencing guidelines were constitutional.[24] While the Court had explicitly reserved that question, many legal commentators agreed that *Apprendi* and *Ring* required invalidation of the federal sentencing guidelines.[25] One federal district court has also reached the same conclusion.[26]

The issue seemingly came to a head in *Blakely v. Washington.*[27] In *Blakely*, the Supreme Court had before it a determinate sentencing scheme much like the federal sentencing guidelines. Blakely pled guilty to kidnaping, which, standing alone, carried a maximum sentence of 53 months. However, under Washington's sentencing scheme, "[a] judge may impose a sentence above the standard range if he finds 'substantial and compelling reasons justifying an exceptional sentence.'"[28] Before enhancing a sentence the judge is required to set forth findings of fact and conclusions of

---

**20.** *Id.* at 552, 120 S.Ct. 2348.

**21.** 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002).

**22.** *Id.* at 602, 122 S.Ct. 2428 (citation omitted).

**23.** *Id.* at 609, 122 S.Ct. 2428 (citation omitted).

**24.** *See* Rachel E. Barkow, *Recharging the Jury: The Criminal Jury's Constitutional Role in an Era of Mandatory Sentencing*, 152 U.PA. L. REV. 33, 40 (2003); Jane A. Dall, Note, *"A Question for Another Day": The Constitutionality of the U.S. Sentencing Guidelines Under* Apprendi v. New Jersey, 78 NOTRE DAME L. REV. 1617 (2003).

**25.** *See, e.g.,* Andrew M. Levine, *The Confounding Boundaries of "Apprendi–Land": Statutory Minimums and the Federal Sentencing Guide-* lines, 29 AM. J. CRIM. L. 377, 435 (2002) ("Under [the principles set forth in *Apprendi* ] the Guidelines, as currently constituted, violate a defendant's constitutional rights to due process rights, notice, and trial by jury."); Note, *The Unconstitutionality of Determinate Sentencing in Light of The Supreme Court's "Elements" Jurisprudence*, 117 HARV. L. REV. 1236, 1252 (2004) ("Under ... the plain language of *Apprendi* and its progeny, the sentencing system created by the Sentencing Reform Act is unconstitutional.").

**26.** *United States v. Green*, 2004 WL 1381101 (D.Mass. June 18, 2004).

**27.** —— U.S. ——, 124 S.Ct. 2531, 159 L.Ed.2d 403, 2004 WL 1402697.

**28.** *Id.* at 2536 (quoting Wash. Rev.Code Ann. § 9.94A.120(2)).

law. The Washington trial court determined that Blakely had acted with " 'deliberate cruelty,' a statutorily enumerated ground for departure in domestic-violence cases," [29] and enhanced his sentence to 90 months. Blakely appealed, arguing that this enhancement violated his right to trial by jury as set forth in *Apprendi.*

In a five-to-four decision, the Supreme Court agreed with Blakely. After briefly reviewing *Apprendi* and *Ring*, the Court stated, "In each case, we concluded that the defendant's constitutional rights had been violated because the judge had imposed a sentence greater than the maximum he could have imposed under state law without the challenged factual finding." [30] The State objected that the case was distinguishable from *Apprendi* and *Ring* because the statutory maximum in Washington for Class B felonies is ten years and Blakely received only 90 months. The Court rejected this argument:

> Our precedents make clear ... that the "statutory maximum" for *Apprendi* purposes is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant* ... In other words, the relevant "statutory maximum" is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose *without* any additional findings. When a judge inflicts punishment that the jury's verdict alone does not allow, the jury has not found all the facts which the law makes essential to the

punishment ... and the judge exceeds his proper authority. [31]

In a footnote, the Court noted that the United States was concerned that a ruling in favor of Blakely would call the federal guidelines into serious doubt. "The United States, as *amicus curiae*, urges us to affirm. It notes differences between Washington's sentencing regime and the Federal Sentencing Guidelines but questions whether those differences are constitutionally significant .... The Federal Guidelines are not before us, and we express no opinion on them." [32]

Four justices dissented. The lead dissent, authored by Justice O'Connor and joined in part by Chief Justice Rehnquist and Justices Kennedy and Breyer, predicted that the "practical consequences of today's decision may be disastrous ...." [33] Justice O'Connor explained that "Washington's sentencing system is by no means unique" since "[n]umerous other States have enacted guidelines, as has the Federal Government." [34] She warned that "[t]oday's decision casts constitutional doubt over them all and, in so doing, threatens an untold number of criminal judgements." Justice O'Connor chided the majority for "ignor[ing] the havoc it is about to wreak on trial courts across the country." [35]

That a ruling in favor of Blakely would have such effects was argued to the Court by the United States in its *amicus curiae* brief.[36] The government pointed out that the federal sentencing guidelines contain a provision very much like the Washington

---

29. *Id.* (citing Wash. Rev.Code Ann. § 9.94A.390(2)(h)(iii)).

30. *Id.*

31. *Id.*

32. *Id.* at 2536 n. 9.

33. *Id.* at 2543 (O'Connor, J., dissenting).

34. *Id.* at 2549 (O'Connor, J., dissenting) (citing 18 U.S.C. § 3553 & 28 U.S.C. § 991 *et seq.*, in addition to statutes in nine states).

35. *Id.* at 2549 (O'Connor, J., dissenting).

36. Brief for the United States as Amicus Curiae Supporting Respondent at 25–30.

State provision at issue. The federal guidelines allow the judge to impose a sentence above the prescribed range "if the judge finds 'that there exists an aggravating . . . circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described.'"[37] The government further warned that "if the Court rules that *Apprendi* applies here based on petitioner's theory that the statutory maximum for purposes of *Apprendi* is the punishment that would be imposed without any findings of fact other than the 'facts reflected in the jury verdict alone' or the guilty plea alone," the federal guidelines would be called into serious question since "facts other than the elements of the offense enter into almost all of the calculations under the Guidelines, beginning with the most basic calculations for determining the offender's presumptive sentencing range."[38] While the government did offer some possible distinctions, it was apparently of the view that a ruling in favor of Blakely could well invalidate the federal sentencing guidelines system.

Justice O'Connor concluded by explaining that "the 'extraordinary sentence' provision struck down today is as inoffensive to the holding of *Apprendi* as a regime of guided discretion could possibly be" because "the State's 'real facts' doctrine precludes reliance by sentencing courts upon facts that would constitute the elements of a different or aggravated offense."[39] In Justice O'Connor's view, "If the Washing-

ton scheme does not comport with the Constitution, it is hard to imagine a guidelines scheme that would."[40]

Justice Breyer also dissented. In concluding his dissent, he observed, "Until now, I would have thought the Court might have limited *Apprendi* so that its underlying principle would not undo sentencing reform efforts. Today's case dispels that illusion."[41] The Court's opinion, Justice Breyer concluded, would "at a minimum . . . set[ ] aside numerous state efforts in that direction. Perhaps the Court will distinguish the Federal Sentencing Guidelines, but I am uncertain how."[42] As a result, thought Justice Breyer,

> this case affects tens of thousands of criminal prosecutions, including federal prosecutions. Federal prosecutors will proceed with those prosecutions subject to the risk that all defendants in those cases will have to be sentenced, perhaps tried, anew.[43]

## III. APPLICATION OF BLAKELY TO THIS CASE

 While this court has searched diligently for a way to disagree with the warnings of the dissenters, the inescapable conclusion of *Blakely* is that the federal sentencing guidelines have been rendered unconstitutional in cases such as this one. The rule set forth by the Supreme Court in *Blakely* was that "the 'statutory maximum' for *Apprendi* purposes is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant.*"[44] A sentence may not be enhanced

---

37. *Id.* at 25 (quoting 18 U.S.C. § 3553(b)(1)).

38. *Id.* at 25–26.

39. *Blakely,* —— U.S. at ——, 124 S.Ct. 2531, 2550 (O'Connor, J., dissenting) (citing Wash. Rev.Code Ann. § 9.94A.370(2) (2000) (codifying "real facts" doctrine)).

40. *Id.* at 2550 (O'Connor, J., dissenting).

41. *Id.* at 2561 (Bryer, J., dissenting).

42. *Id.* at 2561 (Breyer, J., dissenting).

43. *Id.* (Breyer, J., dissenting).

44. *Id.* at 2536.

when doing so requires the judge to make factual findings which go beyond the defendant's plea or the verdict of the jury. Given this rule, there is no way this court can sentence Croxford under the federal sentencing guidelines without violating his right to trial by jury as guaranteed by the Sixth Amendment.

Croxford pled guilty to violating 18 U.S.C. § 2251(a), which is governed by § 2G2.1 of the sentencing guidelines. That guideline establishes a Base Offense Level of 27.[45] The Guidelines also list some Specific Offense Characteristics which can adjust the base offense level. For example, when the victim is under 12 years of age, a four-level increase is mandated.[46] Where the defendant was a parent, relative, or legal guardian of the victim, another two-level increase is mandated.[47] Croxford admitted in his plea colloquy that he knew C.C. was under the age of 12. He also admitted that he was the legal guardian of C.C. Thus, given that these were facts "admitted by the defendant," the court could apply a six-level enhancement, raising Croxford's offense level to 33 (offset by a three-level reduction for accepting responsibility).

However, two additional provisions of the Guidelines are also at issue. Based on Croxford's fleeing of the jurisdiction prior to trial, the pre-sentence report recommended a two-level enhancement for obstruction of justice under § 3C1.1 of the Guidelines. In addition, there was evidence presented to the court that a second minor, A.M., had also been victimized by Croxford. Under the "relevant conduct" guideline, § 1B1.3 of the guidelines, the pre-sentence report recommended another two-level enhancement for this fact. Ap-plication of these two enhancements would require findings of fact by the court, increase Croxford's penalty by four levels, and lead to a penalty beyond the maximum permitted for the conduct admitted to by Croxford. Instead of facing an offense level of 30 (maximum penalty of 121 months), with the enhancements Croxford is facing an offense level of 34 (penalty range of 151 to 188 months). This appears to be not merely an increase in the minimum penalty that Croxford would otherwise face,[48] but an increase beyond the maximum penalty otherwise specified in the Guidelines. The government has not argued otherwise. The court accordingly concludes that application of these enhancements would violate the Sixth Amendment.

The obstruction-of-justice enhancement, located in § 3C1.1 of the Guidelines, was essentially addressed by both the dissent and majority in *Blakely*. Justice O'Connor cites it as an example of a provision that is undermined by the majority's reasoning.

Some facts that bear on sentencing either will not be discovered, or are not discoverable, prior to trial. For instance, a legislature might desire that defendants who act in an obstructive manner during trial or post-trial proceedings receive a greater sentence than defendants who do not. *See, e.g.,* United States Sentencing Commission, Guidelines Manual, § 3C1.1 .... In such cases, the violation arises too late for the State to provide notice to the defendant or to argue the facts to the jury. A State wanting to make such facts relevant at sentencing must now either vest sufficient discretion in the judge to ac-

---

**45.** U.S.S.G. § 2G2.1(a).

**46.** U.S.S.G. § 2G2.1(b)(1).

**47.** U.S.S.G. § 2G2.1(b)(2).

**48.** *Cf. Harris v. United States,* 536 U.S. 545, 122 S.Ct. 2406, 153 L.Ed.2d 524 (2002) (finding no *Apprendi* problem with enhanced mandatory minimum sentences).

count for them *or* bring a separate criminal prosecution for obstruction of justice or perjury.[49]

The majority responded to this argument by *agreeing* with Justice O'Connor that its holding would require a jury to find the defendant guilty of obstruction:

> Another example of conversion from separate crime to sentence enhancement that Justice O'Connor evidently does not consider going "too far" is the obstruction-of-justice enhancement.... Why perjury during trial should be grounds for a judicial sentence enhancement on the underlying offense, rather than an entirely separate offense to be found by a jury beyond a reasonable doubt (as it has been for centuries, see 4 W. Blackstone, Commentaries on the Laws of England 136–138 (1769)), is unclear.[50]

The fact that the obstruction of justice in this case occurred before the trial is irrelevant to the holding of *Blakely*. It is clear that after *Blakely* this court cannot impose additional time on a criminal defendant through a judicial finding that he is guilty of obstruction of justice.

Nor can the court impose an enhancement under the relevant conduct guideline for the crimes allegedly committed against A.M. This conduct was not charged in the indictment and was not admitted by the defendant. Thus, a factual finding by this court would be required to apply the enhancement. The clear command of *Blakely* is that such factual findings, unless admitted by the defendant, must be made by a jury. As the Supreme Court stated in *Apprendi*, "[T]rial by jury has been understood to require that *'the truth of every accusation*, whether preferred in the shape of indictment, information, or appeal, should afterwards be confirmed by the unanimous suffrage of twelve of [the defendant's] equals and neighbors ....'"[51]

Additionally, while courts apply a preponderance of the evidence standard to the Guidelines,[52] *Apprendi* and its progeny make clear that the "companion right [to trial by jury is] to have the jury verdict based on proof beyond a reasonable doubt."[53] Further, judges are often privy to evidence that juries never hear. The federal sentencing guidelines allow judges to make their findings while considering "relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy."[54] The Federal Rules of Evidence also specifically do not apply to sentencing.[55] Presumably, if sentence-enhancing facts must now be charged and proven to a jury beyond a reasonable doubt, constitutional evidentiary safeguards will apply. Thus, both the standard of proof required and the evidentiary procedures in applying the Guidelines violate the Supreme Court's holdings in *Apprendi* and its progeny.

In an effort to avoid these seemingly inevitable conclusions, the government half-heartedly offered several arguments for distinguishing the federal guidelines from the Washington guidelines in its *amicus* brief in *Blakely*. None of these argu-

---

49. *Blakely*, —— U.S. at ——, 124 S.Ct. 2531, 2546 (O'Connor, J., dissenting).

50. *Id.* at 2540 n. 11.

51. *Apprendi*, 530 U.S. at 477, 120 S.Ct. 2348 (quoting 4 W. Blackstone, Commentaries on the Laws of England 343 (1769)).

52. U.S.S.G. § 6A1.3 cmt.

53. *Apprendi*, 530 U.S. at 478, 120 S.Ct. 2348.

54. U.S.S.G. § 6A1.3.

55. *See* Fed.R.Evid. 1101(d)(3).

ments are persuasive, as the government itself seemingly recognized.

The government argued that "unlike the Washington system, the federal Guidelines are not enacted by a legislature but are promulgated by the Sentencing Commission, an independent commission in the judicial branch of the United States."[56] The government further claimed that the Washington system set a "sentencing range" as opposed to the "presumptive sentencing range" set in the federal guidelines. Neither of these distinctions is persuasive, as Justice O'Connor explained in her dissent:

> It is no answer to say that today's opinion impacts only Washington's scheme and not others, such as, for example, the Federal Sentencing Guidelines.... The fact that the Federal Sentencing Guidelines are promulgated by an administrative agency nominally located in the Judicial Branch is irrelevant to the majority's reasoning. The Guidelines have the force of law, *see Stinson v. United States,* 508 U.S. 36, 113 S.Ct. 1913, 123 L.Ed.2d 598 (1993); and Congress has unfettered control to reject or accept any particular guideline, *Mistretta [v. United States],* 488 U.S. at 393–394, 109 S.Ct. 647.
>
> The structure of the Federal Guidelines likewise does not, as the Government half-heartedly suggests, provide any grounds for distinction.... Washington's scheme is almost identical to the upward departure regime established by 18 U.S.C. § 3553(b) and implemented in USSG § 5K2.0. If anything, the structural differences that do exist make the Federal Guidelines more vulnerable to attack. The provision struck down here provides for an increase in the upper bound of the presumptive sentencing range if the sentencing court finds, "considering the purpose of [the Act], that there are substantial and compelling reasons justifying an exceptional sentence." Wash. Rev.Code Ann. § 9.94A.120 (2000). The Act elsewhere provides a nonexhaustive list of aggravating factors that satisfy the definition. § 9.94A.390. The Court flatly rejects respondent's argument that such soft constraints, which still allow Washington judges to exercise a substantial amount of discretion, survive *Apprendi....* This suggests that the hard constraints found throughout chapters 2 and 3 of the Federal Sentencing Guidelines, which require an increase in the sentencing range upon specified factual findings, will meet the same fate. *See, e.g.,* USSG § 2K2.1 (increases in offense level for firearms offenses based on number of firearms involved, whether possession was in connection with another offense, whether the firearm was stolen); § 2B1.1 (increase in offense level for financial crimes based on amount of money involved, number of victims, possession of weapon); § 3C1.1 (general increase in offense level for obstruction of justice).[57]

Finally, it is worth noting a passage in the Court's opinion in *Blakely* seemed to envision that the federal sentencing guidelines would end up being invalidated under *Apprendi.* The *Blakely* dissenters argued that the *Apprendi* approach was unfair to defendants. The majority responded: "Any evaluation of *Apprendi*'s 'fairness' to criminal defendants must compare it with the regime it replaced, in which a defendant, with no warning in either his indictment or plea, would routinely see his maximum potential sentence balloon from as

---

56. *Blakely,* —— U.S. at ——, 124 S.Ct. 2531, 2549 (O'Connor, J., dissenting).

57. *Id.* (O'Connor, J, dissenting).

little as five years to as much as life imprisonment."[58] The majority then cited the provision of the *federal* statutes dealing with drug sentences.[59] The majority's pointed example of a federal drug sentence as one that was most problematic clearly suggests that the opinion's reasoning extends to the federal Guidelines.

For all these reasons, to the extent that the Guidelines require an upward enhancement of the defendant's sentencing range without a jury determination, this court concludes that they do not satisfy the commands of *Blakely*. In reaching this conclusion, the court hastens to add that not all criminal defendants will be able to successfully mount such a challenge. Where the Guidelines can be applied without additional factual findings by the court beyond those found by a jury (or perhaps admitted as part of a plea proceeding), the Guidelines will still apply. The Court in *Blakely* made it clear that determinate sentencing schemes are not *per se* unconstitutional. "By reversing the judgment below, we are not, as the State would have it, 'find[ing] determinate sentencing schemes unconstitutional.' ... This case is not about whether determinate sentencing is constitutional, only about how it can be implemented in a way that respects the Sixth Amendment."[60] This may suggest that for future guilty pleas, the government may wish to ensure that the "statement in advance of plea" signed by the defendant includes all the necessary facts for application of the Guidelines and that indictments include necessary facts for applying the Guidelines. Moreover, defendants are always free to waive any rights they might have under *Blakely*, a point discussed at some length in the majority and dissenting opinions in that case.[61] These issues can

be sorted out in future cases. Here, however, additional facts beyond those contained in the indictment and the plea agreement are required to apply the enhancements, and *Blakely* does not permit use of such facts.

## IV. REMEDY FOR THE UNCONSTITUTIONALITY OF THE GUIDELINES

In light of the fact that the court cannot constitutionally apply two upward enhancements to Croxford, the next question to be decided is the appropriate remedy for this constitutional problem. *Blakely* provides no guidance on this critical issue. Indeed, as Justice O'Connor asked about these "unsettling" consequences in her dissenting opinion: "How are courts to mete out guidelines sentences? Do courts apply the guidelines as to mitigating factors, but not as to aggravating factors? Do they jettison the guidelines altogether? The Court ignores the havoc it is about to weak on trial courts across the country."[62]

In an effort to avoid havoc, the court believes that three options for dealing with *Blakely* are worthy of consideration: (1) the court could convene a sentencing jury, which would determine (presumably by proof beyond a reasonable doubt) whether the facts underlying the enhancement could be proven; (2) the court could continue to follow the other sections of the Guidelines apart from the defective upward enhancement provisions; or (3) the court could treat the Guidelines as unconstitutional in their entirety in this case and sentence Croxford between the statutory minimum and maximum. The court be-

---

58. *Id.* at 2541.

59. *Id.*, citing 21 U.S.C. § 841(b)(1)(A), (D).

60. *Id.* at 2540.

61. *See id.* at 2541, 2552–53 (Breyer, J., dissenting).

62. *Id.* at 2549 (O'Connor, J., dissenting).

lieves that the third option is the only viable one.

■ As to the first option—convening a sentencing jury—a jury would be convened to "decide whether the government has proved any aggravating facts (other than prior conviction), beyond a reasonable doubt. Once a sentencing jury made its determination, the court could then determine an appropriate sentence within the range authorized by the jury's verdict." [63] This approach has been described in one detailed opinion as "*Apprendi*-izing" juries.[64]

The court finds that this approach is not legally authorized and not practical. As a legal matter, this solution is problematic because it effectively requires the courts to redraft the sentencing statutes and implementing Guidelines. In *Blakely*, the Court declined to revise the Washington scheme and here that appears to be a task uniquely left to Congress. It is settled doctrine that "[s]tatutes should be construed to avoid constitutional questions, but this interpretive canon is not a license for the judiciary to rewrite language enacted by the legislature." [65]

Currently the Guidelines contemplate a system in which the probation office gathers facts subject to the parties' objection and presents them to the judge for disposition. Based on the probation officer's report, the court then makes factual findings that can be reviewed on appeal. To say that some, but not all, of these duties are summarily transferred to a sentencing jury would upset the entire scheme. Furthermore, because the duties of probation officers and judges are specified in the Guidelines, any judicial redistribution of duties would necessarily involve a reworking of the statute. As one example of the reworking that would need to be done, the Federal Rules of Criminal Procedure currently provided that "the court" shall determine any disputed sentencing matter.[66]

As a practical matter, it would be impossible to simply confer upon the jury all of the judge's duties under the Guidelines statutes. The current regime requires judges to make extensive findings that affect the sentence.[67] While juries generally are adept at determining the guilt or innocence of a defendant, the list of findings contemplated by the Guidelines is extensive and nuanced, modified and interpreted regularly in numerous court opinions. Making such findings is a task much assigned to judges, not to juries.

An illustration from the obstruction of justice guideline applicable in this case will prove the point. It would be virtually impossible for application of that guideline to be determined by a jury. For starters, the guideline requires consideration of obstructive conduct with respect to information provided to the probation office.[68] This would require a jury to evaluate the process by which the court collects evidence for a pre-sentence report—not an appropriate subject for jury determination. More serious, the guideline instructs that certain types of conduct "ordinarily do not warrant application of this [obstruction] adjustment but may warrant a greater sentence within the otherwise applicable

---

**63.** *United States v. Green*, —— F.Supp.2d ——, 2004 WL 1381101 (D.Mass.2004).

**64.** *Id.*

**65.** *Salinas v. United States*, 522 U.S. 52, 59–60, 118 S.Ct. 469, 139 L.Ed.2d 352 (1997) (citation omitted), *cert. denied*, 522 U.S. 1014, 118 S.Ct. 599, 139 L.Ed.2d 487 (1997).

**66.** Fed. R.Crim. Pro. 32(i)(3).

**67.** *See* 18 U.S.C. § 3553(a).

**68.** *See* U.S.S.G. § 3C1.1, Application Notes 1, 4(e), 4(f), 5(e).

guideline range or affect the determination of whether other guideline adjustments apply (e.g., Acceptance of Responsibility)." [69] The only way a jury could begin to decide whether a defendant's conduct amounted to obstruction (warranting an adjustment to the base offense level) as opposed to something less serious (warranting only a greater sentence within the applicable guideline range) would be to fully understand how the Guidelines system operates. It would be impossible to give lay jurors this kind of legal instruction.

Other problems exist as well. The Guidelines contemplate information being evaluated in the sentencing process that is not normally given to a jury. For example, could the jury order a psychiatric or psychological examination to determine the mental state of the defendant,[70] as the court ordered in this case? Furthermore, the Guidelines currently require the court to state its reasons for the sentence on the record.[71] It is a hard enough task to require twelve independent minds to agree on the question of guilt, let alone the Herculean task of getting them to unite behind each factual finding relevant to the sentencing and then put forth a single, representative voice to express their common will to provide a sufficient basis for appellate review. Additionally, the Guidelines and Rule 32 of the Rules of Criminal Procedure make room for ongoing dialogue between the court, the parties, and the probation office. For example, under certain circumstances, the court is required to notify the parties before it takes certain actions.[72] Also, the Guidelines contemplate that the probation officer will provide a pre-sentence report to the court before sentencing.[73] While such dialogue is feasible where the court, parties, and probation office have an ongoing relationship, if the jury were to don the judge's robe for sentencing, it might have to remain empaneled for weeks at a time just to determine a sentence.

In short, the idea of simply breaking off a number of judicial duties to give to juries cannot work without significant reforms to the Guidelines system, reforms that can only be implemented by Congress.

■ The second option is to follow the Guidelines, but only to the extent that the Guidelines do not require additional fact-finding about an enhancement for aggravating factors beyond that contained in the plea or in the jury's verdict. For instance, in this case the court might take the facts admitted in the plea agreement and apply these to the Guidelines, but not additional facts that aggravate the sentence—i.e., not the facts regarding obstruction of justice and the exploitation of A.M. This approach would appear to solve the Sixth Amendment problem with the Guidelines in this case: the defendant seemingly cannot complain about applying a sentencing scheme to facts that he has sworn to in court, and *Blakely* allows a reduction in sentencing range without any jury findings.

Such an approach would be arguably permitted if the unconstitutional parts of the sentencing scheme (i.e., unconstitutional enhancements) could be severed from the other sections of the scheme. As the Supreme Court has explained, "[u]nless is it evident that the Legislature would not have enacted those provisions which are within its power, independently of that which is not, the invalid part may be dropped if what is left is fully operative as

---

69. *See id.,* Application Note 5.

70. *See* 18 U.S.C. 3552(c).

71. *See* 18 U.S.C. § 3553(c).

72. *See* 18 U.S.C. § 3553(d).

73. U.S.S.G. § 6A1.1; *see also* Fed. R.Crim. Pro. 32(g).

a law." [74] Here it is evident—indeed, plainly evident—that Congress would not have adopted the sentencing scheme without such enhancements.

For starters, the Sentencing Reform Act of 1984 contains no severability clause.[75] As a result, as the Ninth Circuit has explained in construing this very Act, the absence of such a clause "does suggest that Congress intended to have the various components of the sentencing reform package operate together or not all." [76] Moreover, the legislative history to the Act describes the reforms as a "comprehensive plan." [77] Thus, the Ninth Circuit when faced with how to deal with an unconstitutional portion of the Act explained, "Congress having chosen a 'comprehensive' approach to making sentencing more determinate, we will not sever companion sections of the guidelines system that would introduce piecemeal reforms." [78]

Severing just the enhancements would also not square with the core purposes of the Sentencing Reform Act of 1984. In the opening section of the Act, Congress set forth its basic purposes: to insure that criminal sentences are structured "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense" as well as to "afford adequate deterrent to criminal conduct … [and] protect the public from further crimes of the defendant." [79]

Applying only the *Blakely*-proof portions of the Guidelines would hardly square with these goals. It would create a one-way street, in which the defendant would benefit from downward adjustments to the Guidelines, but would not face upward adjustments. In this case, for example, the defendant would presumably seek to have his offense level adjusted downward by three levels for accepting responsibility—even though there has been no jury determination of that fact—while at the same time opposing any upward adjustment for obstructing justice or exploiting A.M.—on grounds that there has been no jury determination of these facts. Essentially the defendant would be arguing "what's mine is mine, what's yours is negotiable." The Guidelines, however, are a holistic system, calibrated to produce a fair sentence by a series of both downward *and* upward adjustments. As the Guidelines themselves explain, "The Guidelines Manual in effect on a particular date shall be applied *in its entirety.*" [80] To look at only one half of the equation would inevitably tug downward on criminal sentences, perhaps producing sentences that do not provide just punishment or protect public safety. The Congress would never have adopted such a one-sided approach. Accordingly, the court cannot give effect to only the *Blakely*-proof parts of the Guidelines but not the other parts.

**74.** *Buckley v. Valeo,* 424 U.S. 1, 108, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976).

**75.** P.L. 98–473 (Oct. 12, 1984); *see also Gubiensio-Ortiz v. Al Kanahele,* 857 F.2d 1245, 1267 (9th Cir.1988) ("The [Sentencing Reform] Act [of 1984] does not contain any severability clause."), *judgment vacated on other grounds,* 488 U.S. 1036, 109 S.Ct. 859, 102 L.Ed.2d 984 (1989).

**76.** *Gubiensio-Ortiz,* 857 F.2d at 1267.

**77.** S.Rep. No. 225 at 46, 98th Cong., 2d Sess., 1984 U.S.C.C.A.N. 3229, 3228; *see also id.* at 38 (quoting Attorney General William French

Smith that the reforms "introduce a totally new and comprehensive sentencing system that is based on a coherent philosophy"); *id.* at 39 ("sentencing legislation should contain a comprehensive and consistent statement of the Federal law of sentencing").

**78.** *Gubiensio-Ortiz,* 857 F.2d at 1268.

**79.** 18 U.S.C. § 3553(a)

**80.** U.S.S.G. § 1B1.11 (emphasis added).

By default, then, in this case the court is left with only the third option—treating the Guidelines as inapplicable. What this means is that the court will not follow the Guidelines in sentencing defendant Croxford. However, the constitutional defects in the Guidelines do not necessarily permeate other parts of the criminal code. The court must still adhere to the statutory commands setting statutory maximum (and, perhaps, minimum sentences). In this case, for instance, Congress has set a maximum possible penalty of twenty years in prison,[81] with which the court will comply. Congress has also set a mandatory minimum penalty of ten years in prison.[82] The defendant has not challenged the constitutionality of this penalty, seeking only a sentence at that minimum. Moreover, even if such a challenge had been raised, the court would find it unnecessary to consider it, as the court in exercising its judgment as to the appropriate sentence would clearly impose a sentence at or above the minimum term. Accordingly, any constitutional questions about whether defects in the Guidelines system further infect the mandatory minimum sentences can be left to another day. In sum, the court will handle the sentencing in this matter as the courts handled sentencings before the Guidelines—by making a full examination of the relevant evidence and imposing an appropriate sentence within the statutory range set by Congress.

In reviewing the whole record, the next question is what kinds of evidence the court can review. In particular, is the court restricted to the narrow facts contained in the indictment and the statement in advance of plea? Or can the court look more broadly at a wide range of information, including in this case (for example) information that the defendant obstructed justice and exploited A.M. The court believes that it is free to examine all relevant information. This conclusion is supported by the Supreme Court's decision more than a half-century ago in *Williams v. New York*,[83] discussed in *Blakely*. In *Williams* a jury found Williams guilty of first-degree murder and recommended a sentence of life imprisonment. The judge disregarded the jury's recommendation and imposed a sentence of death. The judge based his decision both on evidence given in open court and evidence obtained from the Probation Department and other outside sources. Williams appealed, arguing that the use of evidence in sentencing which had not been submitted to an adversarial process including confronting witnesses, cross-examination, and rebuttal, violated his due process rights. The Supreme Court rejected Williams' contention:

> Tribunals passing on the guilt of a defendant always have been hedged in by strict evidentiary procedural limitations. But both before and since the American colonies became a nation, courts in this country and in England practiced a policy under which a sentencing judge could exercise a wide discretion in the sources and types of evidence used to assist him in determining the kind and extent of punishment to be imposed within limits fixed by law.[84]

The Court further noted that "there are sound practical reasons for the distinction" between "evidentiary rules governing trial

---

**81.** 18 U.S.C. § 2251(d)(2000), *amended in* 2003 *by* Pub. L. No. 108–21, 18 U.S.C. § 2251(e).

**82.** 18 U.S.C. § 2251(d)(2000), *amended in* 2003 *by* Pub. L. No. 108–21, 18 U.S.C. § 2251(e).

**83.** 337 U.S. 241, 69 S.Ct. 1079, 93 L.Ed. 1337 (1949).

**84.** *Id.* at 246, 69 S.Ct. 1079.

and sentencing procedures."[85] At trial, only "evidence that is strictly relevant to the offense charged" is admitted in order to "prevent a time consuming and confusing trial of collateral issues."[86] Evidentiary rules governing trial also protect criminal defendants by preventing the jury from finding the defendant guilty based on unrelated misconduct.[87]

A sentencing judge, however, is not confined to the narrow issue of guilt. His task ... is to determine the type and extent of punishment after the issue of guilt has been determined. Highly relevant—if not essential—to his selection of an appropriate sentence is the possession of the fullest information possible concerning the defendant's life and characteristics. And modern concepts individualizing punishment have made it all the more necessary that a sentencing judge · not be denied an opportunity to obtain pertinent information by a requirement of rigid adherence to restrictive rules of evidence properly applicable to the trial.[88]

Most important for present purposes, the Court in *Williams* pointed out that "New York criminal statutes set wide limits for maximum and minimum sentences" and that "[i]n determining whether a defendant shall receive a one-year minimum or a twenty-year maximum sentence, we do not think the Federal Constitution restricts the view of the sentencing judge to the information received in open court."[89]

In *Blakely*, the Court specifically approved of the sentencing scheme set forth in *Williams* because it involved an "inde-terminate-sentencing · regime which allowed a judge (but did not compel him) to rely on facts outside the trial record."[90] Further *Williams* did· not involve "a sentence greater than what state law authorized on the basis of the verdict alone."[91]

With the Guidelines out of play in this case, this court finds itself employing an indeterminate-sentencing scheme such as existed in *Williams*. The irony is that after *Blakely*, this court is free to consider the same evidence which, under the unconstitutional Guidelines scheme, would have had to be proven to a jury beyond a reasonable doubt—including evidence of obstruction of justice and multiple victims. The only limitation placed on this court by *Blakely* is the prohibition against decreeing a sentence greater than the statutory maximum—now twenty years. Some observers may conclude that this is paradoxical, inasmuch as *Blakely*'s core goal is to insure jury fact-finding at sentencing. However, *Blakely*'s constitutional requirement is that "the prosecutor prove to a jury all facts *legally essential* to the punishment."[92] Because the only "legally essential" fact to punishing Croxford in the statutorily-mandated range of ten to twenty years is the fact of conviction, there is no constitutional prohibition to the court considering the evidence surrounding these alleged facts.

■ At the same time, the court might also now be free to consider facts that the Guidelines would make irrelevant. In this case, for example, it appears based on a detailed, court-ordered psychiatric report

---

85. *Id.*

86. *Id.* at 247, 69 S.Ct. 1079.

87. *Id.*

88. *Id.*

89. *Id.* at 251, 69 S.Ct. 1079.

90. *Blakely*, —— U.S. at ——, 124 S.Ct. 2531, 2538.

91. *Id.*

92. *Blakely*, —— U.S. at ——, 124 S.Ct. 2531, 2542 (emphasis added).

that the defendant was sexually abused as a child on numerous occasions. Under the Guidelines, such facts are "ordinarily not relevant" in determining whether to depart from the guideline range.[93] Because the court is apparently now more free to consider this evidence, in order to avoid giving the defendant grounds to appeal (which, if successful, might further traumatize the young victim) the court has taken the evidence into consideration by slightly reducing the defendant's sentence.

█ A final question is whether the court can look at the Guidelines for guidance in determining the appropriate sentence in this case, even though the Sixth Amendment forbids giving them the force of law. The court will consider the Guidelines as providing useful instruction on the appropriate sentence. The Sentencing Commission has carefully developed the Guidelines over many years, and the Guidelines generally produce sentences that accord with the public's views of just punishment.[94] They are a valuable source of information, even though they are not binding in this case. Additionally, implementation of the Guidelines was based largely on the pre-sentence report compiled by a probation officer. As the Supreme Court noted as long ago as *Williams*, these reports "have been given a high value by conscientious judges who want to sentence persons on the best available information rather than on guesswork and inadequate information."[95]

In sum, the court concludes that Croxford must be sentenced between the statutorily-required terms of 10 to 20 years in prison, with the appropriate sentence to be determined after consideration of all relevant evidence.

## V. DETERMINATION OF THE SENTENCE

### A. The Prison Sentence.

█ The court must next determine the appropriate prison sentence for defendant Croxford. Any determination of the sentence must start with the fact that the defendant has gravely harmed C.C., the victim of the indicted offense. By forcing her to participate in the taking of sexually-explicit photographs, the defendant has caused untold psychiatric injury seriously damaged her potential for normal development.

The court also concludes, by a preponderance of the evidence, that Croxford has gravely harmed another victim, A.M. Here again, Croxford's acts are extremely serious. The harm to C.C. and A.M. is compounded by the fact that Croxford was these girls' adoptive father at the time, abusing this position of trust.

The court further concludes, by a preponderance of the evidence, that Croxford has impeded the proper administration of this case by absconding from Utah shortly before the trial in this matter. This delay was particularly serious because it delayed final resolution of this matter for a considerable period of time, undoubtedly aggravating the trauma felt by the victim C.C. by preventing a final resolution of this case.

The court believes that the proper sentence for someone who has acted in this fashion would be as the Guidelines specify—in the range of 151 to 188 months. The Government originally recommended a sentence no higher 151 months in this case by not objecting to the original pre-

---

93. *See* U.S.S.G. § 5H1.3.

94. *See* PETER H. ROSSI & RICHARD A. BERK, JUST PUNISHMENTS: FEDERAL GUIDELINES AND PUBLIC VIEWS COMPARED (1998).

95. *Williams*, 337 U.S. at 249, 69 S.Ct. 1079.

sentence report which placed the guideline range at 121–151 months and by agreeing in the plea agreement not to urge an upward departure from the Guidelines.[96] At the sentencing hearing, the government was understandably disappointed at the court's ruling announcing the possible demise of the Guidelines and appeared to respond harshly in its sentencing allocution by urging that the defendant be sentenced at the statutory maximum of 20 years. The record should be clear that the court has totally ignored the government's recommendation and has instead proceeded as though the government was vigorously urging a sentence of no more than 151 months. A sentence of 20 years is far beyond what the government initially recommended as part of its plea agreement, and as defendant's counsel argued at the sentencing hearing, such a government recommendation may very well violate the plea agreement. The defendant is entitled to have the government comply with its obligations under the plea agreement. The court wishes to avoid any additional questions on appeal. Because of the young age and vulnerability of the victim, finality is essential in this case. C.C.'s court-appointed attorney specifically argued at the sentencing hearing that C.C. simply would not understand if the case ended up in this court again and urged the court to eliminate as many appellate issues as possible. Because of this, the court will exercise an overabundance of caution to attempt to ensure finality of the sentence.

The court will impose a sentence of 148 months, slightly below the government's initial recommendation and below the applicable—but unconstitutional—Guideline range.

### B. Restitution.

■■ The court must also consider restitution. C.C. will apparently require extensive therapy because of Croxford's crime, and the pre-sentence report recommends the court impose restitution in the amount of $79,968 to cover the costs of this therapy. Under Tenth Circuit case law interpreting the restitution statutes, such restitution is appropriate.[97] The court must also consider, however, whether these restitution statutes are called into question by *Blakely*.

Congress has mandated restitution for crimes of violence generally [98] and for sexual exploitation offenses in particular.[99] The purpose of these statutes "is to force offenders to 'pay full restitution to the identifiable victims of their crimes.'"[100] The statutes require the court to impose restitution for crimes such as the one at issue here.[101] Most important for present purposes, the restitution statutes specify judicial fact-finding rather than jury fact-finding. Under the statutes, the court is required to resolve any factual dispute by a preponderance of the evidence.[102] If *Blakely* applies to restitution issues, then those issues must be submitted to a jury.

96. Plea Agreement, ¶ 13(2)(C).

97. *See United States v. Julian*, 242 F.3d 1245 (10th Cir.2001).

98. 18 U.S.C. § 3663A.

99. 18 U.S.C. § 2259.

100. *United States v. Reano*, 298 F.3d 1208, 1211 (10th Cir.2002) (quoting S.Rep. No. 104–179, at 12 (1996), *reprinted in* 1996 U.S.C.C.A.N. 924, 925); *see also United States*

*v. Bedonie*, 317 F.Supp.2d 1285 (D.Utah 2004).

101. *See* 18 U.S.C. 2259 (the court "shall order" restitution for offenses under chapter 110 dealing with sexual exploitation of children).

102. 18 U.S.C. § 3664(e), made applicable to this case by 18 U.S.C. § 2259(b)(1) & (2).

The Sixth Amendment does not extend to restitution issues for the simple reason that restitution is not a penalty for a crime. The Tenth Circuit has squarely held that the Mandatory Victims Restitution Act (MVRA) does not impose punishment. In *United States v. Nichols*,[103] the Circuit faced the issue of whether to apply the MVRA (adopted in 1996) retroactively to crimes committed by Terry Nichols in 1995. The Circuit concluded that the Constitution's prohibition of ex post facto laws did not bar retroactive application of the new restitution statute because the statute was not punitive. The Circuit explained that the purpose of restitution " 'is not to punish defendants ... but rather to ensure that victims, to the greatest extent possible, are made whole for their losses.' "[104] The Circuit therefore concluded that the MVRA could apply to Nichols because it did not "inflict criminal punishment" upon him and thus was not punitive.[105]

Under the holding of *Nichols*, the Sixth Amendment is not applicable to restitution issues. As *Blakely* itself explains, the Sixth Amendment requires jury determinations where any fact " 'increases the *penalty* for a crime.' "[106] Because restitution is not a penalty, the jury trial right is not implicated and the court will order full restitution in the amount of $79,698.

The court will also order that this amount is due in full immediately.[107] Having considered the relevant factors surrounding the defendant's ability to pay, the court orders that the restitution is payable on a schedule of $25 per quarter or 50% of his income (whichever is greater) while in prison and for sixty days after his release. Thereafter, restitution shall be paid at a rate of $100 per month. At the time of the defendant's release, the probation officer shall take into consideration defendant Croxford's economic status as it pertains to his ability to pay the restitution ordered and shall notify the court of any changes that may need to be made to the payment schedule. The defendant shall advise the court and the Attorney General, through the probation office, of any material change in his financial circumstances.[108]

## VI. MOTION FOR CONTINUANCE TO PERMIT ADDITIONAL BRIEFING

 The United States Attorney's Office for the District of Utah has capably handled this case throughout its long course. With respect to the constitutional issues discussed in this case, the Office has asserted the constitutionality of the Guidelines, but at the same time has acknowledged that future guidance on this issue may be forthcoming in the near future from the Attorney General. The Office has also moved for a continuance of this sentencing until it receives such guidance. The defense has joined in this motion to continue.

---

**103.** 184 F.3d 1169 (10th Cir.1999).

**104.** *Id.* at 1269 (quoting *United States v. Arutunoff*, 1 F.3d 1112, 1121 (10th Cir.1993), *cert. denied*, 510 U.S. 1017, 114 S.Ct. 616, 126 L.Ed.2d 580 (1993)) (citing *United States v. Diamond*, 969 F.2d 961, 968 (10th Cir.1992), and *United States v. Rochester*, 898 F.2d 971, 983 (5th Cir.1990)).

**105.** *Id.* at 1279–80; *accord United States v. Bach*, 172 F.3d 520 (7th Cir.1999), *cert. denied*, 528 U.S. 950, 120 S.Ct. 372, 145 L.Ed.2d 290 (1999).

**106.** *Blakely*, —— U.S. at ——, 124 S.Ct. 2531, 2536, quoting *Apprendi*, 530 U.S. at 490, 120 S.Ct. 2348.

**107.** *See United States v. Bedonie*, 317 F.Supp.2d 1285, 1329–31 (D.Utah 2004) (discussing reasons for amount to be due in full immediately).

**108.** *See* 18 U.S.C. § 3664(k).

The court denies the parties' motion for a continuance. While the parties may be willing to stipulate to further delay, the continuance is opposed by the victim, C.C., represented in this action by a court-appointed guardian.[109] As the guardian argued in opposition to the motion to continue, C.C. has prepared herself for this sentencing hearing and has appeared in person to allocute regarding the appropriate sentence. To delay this already-protracted case even longer could cause serious psychiatric harm to C.C. (C.C. later found enough courage to whisper in her father's ear to allocute to the court about the terrible things Croxford had done to her.)

There is a statutory ground for denying the continuance. Congress has commanded that in cases involving child victims "[t]he court shall ensure a speedy trial in order to minimize the length of time the child must endure the stress of involvement with the criminal process."[110] The government apparently takes the view that this statutory command does not apply to its motion to continue on the ground that a *sentencing* hearing is not implicated in a speedy *trial* guarantee. The court disagrees. In 1957 the Supreme Court assumed "arguendo" that sentencing is part of the trial for purposes of Sixth Amendment speedy trial protection.[111] Since then, the Tenth Circuit and all others which have addressed the issue "have either treated the subject as established law or have perpetuated the Court's assumption in *Pollard*."[112] At least eighteen states have reached the same conclusion.[113] Given that criminal defendants have a "speedy trial" guarantee that embraces sentencing, the court believes that the victims' protection should be equally expansively construed.

Even if the speedy trial provision does not cover this sentencing hearing, Congress has also adopted the (often-overlooked) Victims of Crime Bill of Rights. Placed somewhat awkwardly in Title 42 of the United States Code,[114] the Victims of Crime Bill of Rights requires that the government give victims the right "to confer with [the] attorney for the Government on the case" and also to be "treated with fairness and with respect for the victim's dignity and privacy."[115] In this case, the government apparently did not consult with the victim's guardian before seeking a delay of the sentencing—although given the speed with which events have moved in

---

**109.** *See* 18 U.S.C. § 3509(h) (authorizing appointment of guardian ad litem for child victims); Order for Guardian Ad Litem, Docket # 62–2 (appointing guardian).

**110.** 18 U.S.C. § 3509(j).

**111.** *Pollard v. United States,* 352 U.S. 354, 361, 77 S.Ct. 481, 1 L.Ed.2d 393 (1957).

**112.** *Perez v. Sullivan,* 793 F.2d 249, 253 (10th Cir.1986), *cert. denied,* 479 U.S. 936, 107 S.Ct. 413, 93 L.Ed.2d 364 (1986) (*citing United States v. Sherwood,* 435 F.2d 867, 868 (10th Cir.1970), *cert. denied,* 402 U.S. 909, 91 S.Ct. 1381, 28 L.Ed.2d 649 (1971); *Whaley v. United States,* 394 F.2d 399 (10th Cir.1968); *United States v. Campisi,* 583 F.2d 692, 694 (3rd Cir.1978); *United States v. Reese,* 568 F.2d 1246 (6th Cir.1977); *United States v. Campbell,* 531 F.2d 1333, 1335 (5th Cir.1976), *cert. denied,* 434 U.S. 851, 98 S.Ct. 164, 54 L.Ed.2d 121 (1977); *United States v. Tortorello,* 391 F.2d 587 (2nd Cir.1968)).

**113.** *See Jolly v. State,* —— S.W.3d ——, ——, 2004 WL 1406091 at *5 (Ark.2004).

**114.** *Cf.* The Scott Campbell, Stephanie Roper, Wendy Preston, Louarana Gillis, and Nila Lynn Crime Victims' Rights Act, S. 2329, 108th Cong., 2d Sess. (April 26, 2004) (moving the Crime Victims Bill of Rights to Title 18, where presumably it would be more easily accessible to criminal lawyers).

**115.** 42 U.S.C. § 10606(b)(5) & (1); *see also United States v. Serawop,* 303 F.Supp.2d 1259, 1268 (D.Utah 2004) (discussing the enforcement of Crime Victims Bill of Rights).

the wake of *Blakely,* this action is understandable. Nonetheless, the court believes that in the circumstances of this long-delayed case, the victim's statutory right to be "treated with fairness" requires that it move forward with the sentencing as scheduled.

Entirely apart from the victim's interest in a speedy resolution, the court has its own significant reasons for proceeding expeditiously to resolve *Blakely's* implications even before the Department of Justice has fully formulated its position. It does not appear to be a realistic option to wait. During this week alone, the court has on its calendar six criminal cases set for sentencing. More than a thousand criminal defendants currently have cases pending in the District of Utah. Indeed, as the dissenting justices warned in *Blakely,* there are perhaps tens of thousands of federal cases that are implicated by questions surrounding the constitutionality of the Guidelines. It is important that these cases not be stalled; the questions that *Blakely* raises must be addressed as rapidly as possibly. The motion to continue is therefore denied.

Nonetheless, because the Department may have additional arguments to provide shortly, the court believes that United States should be given an opportunity to file a motion to reconsider this ruling once the Attorney General has formulated a position on these questions. Accordingly, the court directs that, if the United States believes that any of the foregoing conclusions are incorrect, it shall file a motion to reconsider the court's decision as soon as practicable and, in any event, not later than July 9, 2004. The defendant shall file any response one week following any motion to reconsider filed by the United States. In the meantime, the court will withhold final judgment in this case.

## VII. PROCEDURES FOR FUTURE SENTENCINGS

The court realizes that its holding today may apply in many other cases pending before the court. Moreover, the court recognizes that the Supreme Court has yet to speak definitively on the implications of *Blakely* on the federal guidelines and that the Court might somehow find a way next term to validate the Guidelines. If so, this court then might be forced to resentence numerous defendants who, like Croxford, avoided sentencing under the Guidelines.

This potential problem can perhaps be mitigated. Until the constitutionality of the federal sentencing guidelines has been definitively resolved by the Supreme Court, the court will plan to announce two sentences at each sentencing hearing: (1) the sentence the court will impose if application of the Guidelines is unconstitutional; and (2) as a backup, the sentence the court would impose if the Guidelines are later determined to be constitutional. Thus, regardless of how the Supreme Court ultimately resolves the question, no further protracted sentencing hearings need occur. To facilitate the entry of a backup sentence, the court plans to include in its future judgments the following additional boilerplate language:

☐ The court finds that the application of the sentencing guidelines to this defendant is not permitted by *Blakely v. Washington.* Therefore, the sentence in this judgment is a non-guideline sentence. Should the sentencing guidelines later be found to be constitutional, it will be judgment and order of the Court that the defendant be committed to the custody of the United States Bureau of Prisons for a term of _____.
All other terms and conditions of the judgment will remain the same.

☐ The court finds that the application of the sentencing guidelines to this

defendant is permitted by *Blakely v. Washington*. Therefore, the sentence in this judgment is a guideline sentence. Should the sentencing guidelines later be found to be unconstitutional in their entirety, it will be the judgment and order of the Court that the defendant be committed to the custody of the United States Bureau of Prison for a term of _____.

All other terms and conditions of the judgment will remain the same.

☐ The defendant has waived any rights under *Blakely v. Washington*.

In this case, the court will impose a backup sentence under the Guidelines of 151 months, at the low end of the applicable Guideline range and within the applicable Guideline range as agreed to initially by both the government and the defendant when neither raised any objection to the first pre-sentence report in this matter.

■ For future cases, to ensure that the information for such backup sentences is available, the court directs the probation office to continue preparing pre-sentence reports as it has done in the past, with full Guidelines calculations. The court also directs the parties in all criminal cases to continue handling guidelines issues as they have in the past.

■ For all future criminal sentencing, the court also directs the United States Attorney's Office to file an additional pleading addressing the appropriate sentence to be imposed in the event that the Guidelines cannot be constitutionally applied to the defendant at issue. Where feasible, this pleading shall be filed 14 days in advance of sentencing. The defendant shall file any response three days in advance of sentencing.

If the United States Attorney's Office has any concerns about the foregoing, it should feel free to raise them as soon as possible or in any motion to reconsider the court's ruling filed as described in the previous section.

## VIII. CONCLUDING OBSERVATIONS

Because of the significance of the court's holding today, a few concluding observations may be in order.

The court takes no joy in finding serious constitutional defects in the federal guidelines system. To the contrary, the court believes that the federal sentencing guidelines have ensured that federal sentences achieve the purposes of just punishment and deterring future crimes.[116] But the issue before the court today is not the desirability of the Guidelines, but their constitutionality. In the wake of *Blakely*, the court has no choice but to decline to enforce them here.

The court also understands that there will be those who will applaud this ruling, including in particular advocates for the rights of criminal defendants. But while today's ruling may appear to strengthen constitutional protections for defendants, the long run consequences may not be so propitious. If the court is correct that the Guidelines cannot be constitutionally applied in cases such as Croxford's, Congress will obviously be forced to correct the problem. Congress has only a limited number of choices,[117] all of which seem less

116. *See generally* Paul G. Cassell, *Too Severe? A Defense of the Federal Sentencing Guidelines (and a Critique of the Federal Mandatory Minimums)*, 56 Stan. L. Rev. 1017 (2004); Michael Goldsmith & James Gibson, The Federal Sentencing Guidelines: A Surprising Success? (N.Y.U Law Sch. Ctr. for Research in Crime and Justice 1999).

117. *See Blakely*, —— U.S. at ——–——, 124 S.Ct. 2531, 2552–58 (Breyer, J., dissenting) (discussing options available).

desirable for criminal defendants—and the public—than the Guidelines system.

One option would be to return to the indeterminate sentencing scheme that pre-dated the Guidelines.[118] It seems unlikely that Congress will move in this direction. After all, the very purpose of the Sentencing Reform Act, which created the Guidelines, was to eliminate such judicial discretion. Congress was concerned about creating a system where prison sentences "appeared to depend on 'what the judge ate for breakfast' on the day of the sentencing." [119] More recent events, such as passage of the PROTECT Act,[120] suggest that Congress is distrustful of giving judges greater sentencing discretion.

Another option open to Congress would be to replicate the Guidelines system, but with the addition of jury (rather than judicial) fact-finding. This approach, too, seems highly unlikely to be adopted. It is improbable that Congress will elect to create a system where a sentence for robbery, for example, requires a jury to determine factors regarding the nature of the offense such as (1) the nature of the institution robbed; (2) the presence of, brandishing of, or other use of, a firearm; (3) the making a death threat, (4) the presence of ordinary, serious, or permanent or life threatening bodily injury; (5) any abduction; (6) any physical restraint; (7) the taking of a firearm, (8) the taking of drugs, and (9) and the value of property taken; and further factors regarding the defendant's role in the offense such as (10)

aggravating role; (11) mitigating role; (12) abuse of a position of trust; (13) use of a special skill; and (14) use of minor; and further factors regarding the victim such as (15) hate crime motivation; (16) vulnerable victim; (17) official victim; (18) terroristic motivation; and further factors concerning (19) obstruction of justice; and (20) acceptance of responsibility—not to mention another dozen or so grounds for departing upward or downward from the general guidelines calculations.[121] As explained earlier, juries may be poorly suited to making these kinds of determinations, which for decades have been within the province of trial judges. Jury trials also require considerable time and expense for prosecutors and the courts, which Congress may well wish to avoid.

By default, then, Congress may be forced to select a third option: Congress might replace the carefully-calibrated Guidelines with a series of flat mandatory minimum sentences covering not just sexual offenses at issue here but all criminal cases. There is every reason to expect that those mandatory minimum sentences will be quite high, as Congress will understandably give precedence to concerns about public safety rather than to concerns about fine-tuning culpability between various offenders. Indeed, if the experience with mandatory minimum sentences in the areas of drug and firearms offenses is any guide, the mandatory minimum sentences may be extraordinarily tough.

118. *See generally* KATE STITH & JOSÉ A. CABRANES, FEAR OF JUDGING: SENTENCING GUIDELINES IN THE FEDERAL COURTS 9–37 (1998).

119. *Blakely*, —— U.S. at ——, 124 S.Ct. 2531, 2553–54 (Breyer, J., dissenting).

120. *See United States v. Van Leer*, 270 F.Supp.2d 1318, 1322–1323 (D.Utah 2003)

(discussing legislative history of the PROTECT Act).

121. *See id.* (Breyer, J., dissenting) (citing U.S.S.G. § 2B3.1 which requires analysis of these factors); Brief for the U.S. as Amicus Curiae, *Blakely v. Washington*, —— U.S. at ——, 124 S.Ct. at 2553–54, 159 L.Ed.2d at —— (2004). *See generally* U.S.S.G. chapters 2,

Such mandatory minimum sentences pose significant problems for a system of criminal justice.[122] As one architect of the Guidelines has commented:

> Whereas the guidelines permit a degree of individualization in determining the appropriate sentence, mandatory minimums employ a relatively narrow approach under which the same sentence may be mandated for widely divergent cases. Whereas the guidelines provide for graduated increases in sentence severity for additional wrongdoing or for prior convictions, mandatory minimums often result in sharp variations in sentences based on what are often only minimal differences in criminal conduct or prior record. Finally, whereas the guidelines incorporate a "real offense" approach to sentencing, mandatory minimums are basically a "charge-specific" approach wherein the sentence is triggered only if the prosecutor chooses to charge the defendant with a certain offense or to allege certain facts.[123]

The court agrees that the Guidelines are far better than a system of mandatory minimum sentences. But given the constitutional straitjacket imposed by *Blakely*, Congress may decide that it has no choice other than to adopt a determinate sentencing system that creates tough fixed sentences across the board—an outcome that will protect neither the interests of criminal defendants nor, paradoxically, the very right to a jury trial that *Blakely* sought to protect.

Given this bleak prediction about the future, the court hopes that it has overlooked something and that the Guidelines can be constitutionally applied to defendants like Croxford. But the court's fundamental obligation is to support, obey, and defend the Constitution. As interpreted in *Blakely*, the Sixth Amendment forces the court to find the Guidelines unconstitutional in this case.

### CONCLUSION

The court holds the Federal Sentencing Guidelines cannot be constitutionally applied in determining defendant Croxford's sentence. Proceeding without the Guidelines, the court finds that a sentence of 148 months imprisonment and $79,698 is appropriate in this case. Should an appellate court later hold that the Guidelines can be constitutionally applied in this case, the court would impose a Guideline sentence of 151 months.

SO ORDERED.

---

3 and 5 (listing various factors that apply to Guidelines calculations).

**122.** *See Harris v. United States*, 536 U.S. 545, 570–71, 122 S.Ct. 2406, 153 L.Ed.2d 524 (2002) (Breyer, J., concurring in part and concurring the judgment).

**123.** Orrin G. Hatch, *The Role of Congress in Sentencing: The United States Sentencing Commission, Mandatory Minim Sentences, and the Search for a Certain and Effective Sentencing System*, 28 Wake Forest L. Rev. 185, 194 (1993).