UNITED STATES of America,

v.

**Ali Sher KHAN, Defendant.**

**No. 02–CR–1242 JBW.**

United States District Court, E.D. New York.

July 20, 2004.

Barry G. Rhodes, Peter Kirschheimer, The Legal Aid Society Federal Defender Division, Brooklyn, NY, for Defendant.

Lee Joshua Freedman, Brooklyn, NY, for Plaintiff.

*AMENDED MEMORANDUM ORDER & JUDGMENT*

JACK B. WEINSTEIN, Senior District Judge.

TABLE OF CONTENTS

I. Introduction ................................................................ 219

II. Facts......................................................................... 220
    A. Crime and Original Sentence ............................................ 220
    B. Appeal ................................................................ 220

III. Defendant's Background ...................................................... 221
    A. Personal ............................................................. 221
    B. Financial ............................................................ 222

IV. The Guidelines are not Dead ................................................ 223

V. Jury and Court Cooperation in Sentencing ................................... 225
    A. Rationale of *Blakely*................................................ 225
    B. Inherent Difficulty in Determining "Original" Meaning of Jury Trial.......... 226
    C. Discretion of Trial Court to Utilize Varying Procedures .................... 226
    D. Historical Discretion of Court ....................................... 227
    E. Historical Discretion of Jury ........................................ 228
    F. Legislatively Recognized Jury Sentencing Power ...................... 231
    G. Modern Decreased Use of Juries ..................................... 231
    H. Summary ............................................................ 232
    I. Waiver by Parties.................................................... 232

VI. Sentencing Under Guidelines Section 2S1.3(b)(2)............................ 232
    A. Applicable Guideline and Supporting Facts. ........................... 232
    B. Conspiracy.......................................................... 233
    C. Non-application of Feeney Amendment ............................... 233

VII. Conclusion ................................................................ 234

## I. Introduction

This case reflects some of the many sentencing issues raised by the numerous appeals in criminal cases; they arise because of the need to follow mechanical and often harsh sentencing guidelines while taking account of the manifold differences in the human condition. Often, as in the case of this defendant, a recent Pakistani immigrant who prospered as a businessman and was returning to his homeland to share some of the proceeds of his success, the court may not fully understand his milieu.

In *Blakely v. Washington*, the Supreme Court invalidated the State of Washington's sentencing guidelines under the Sixth Amendment to the extent that they authorized judicial fact-finding of enhancement factors warranting a sentence above the applicable guidelines range. —— U.S. ——, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004). *Blakely* does not—as some have speculated—constitute the death knell of the Federal Sentencing Guidelines. *Compare United States v. Croxford,* 324 F.Supp.2d 1230, 1238, 2004 WL 1521560, *6 (D.Utah July 7, 2004) ("[T]he inescapable conclusion of *Blakely* is that the federal sentencing guidelines have been rendered unconstitutional in cases such as this one."), *with United States v. Pineiro,* 377 F.3d 464, 2004 WL 1543170 (5th Cir. July 12, 2004) (declining to extend *Blakely* to the federal guidelines). *See also Mistretta v. United States,* 488 U.S. 361, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989) (strongly supporting Guidelines' constitutionality as appropriate delegation of legislative powers and lack of violation of separation of powers, over dissent of one Justice). *Blakely* does provide Congress, the courts and the

Sentencing Commission with an opportunity and obligation to reevaluate and revise the Guidelines. They are presently, in general (but not as applied in the present case), overly rigid, overly complex, overly harsh, and overly expensive to taxpayers and society. *Blakely*'s reintroduction of the jury into the present sentencing process suggests the desirability of making the Guidelines discretionary guideposts—as their name implies—rather than mandatory precepts, inflexible commands.

An appropriate sentence requires an appreciation of the subtle socioeconomic factors defining and explaining the defendant. Yet the judge is often unlikely to possess detailed knowledge or appreciation of the defendant's background with its subtle cultural and linguistic characterizations—usually so different from the court's: high status, relatively large income, assured medical care, well-to-do friends in high places, and the skills to take advantage of the system and to avoid its pitfalls. *Cf.* Anna Wierzbicka, *On Happiness: A cross-linguistic and cross cultural perspective,* Daedalus 34 (Spring 2004).

There are occasions—and this arguably is one of them—where an advisory jury selected from a representative cross section of the community may serve to bridge the lifestyle and empathy gap between judge and criminal, providing the insights and the opportunity for a more humane and effective administration of justice. As indicated in Parts IV and V, *infra*, reliance on a jury in sentencing is possible for this purpose.

## II. Facts

### A. *Crime and Original Sentence*

Defendant and two of his Pakistani countrymen had labored in the chicken restaurant business. They had assembled substantial cash savings. As is apparently the wont of recent immigrants, they were returning to their homeland families with cash gifts wrapped for specific relatives; they also carried cash entrusted to them by co-workers. *See, e.g.,* Elizabeth Becker, *Latin Migrants to U.S. Send Billions Home,* N.Y. Times, May 18, 2004, at C4 (quoting official at the Inter–American Development Bank: "We want to bring [the $30 billion sent by immigrants to relatives back home] out of the shadows so people understand the critical contribution these hard-working people are making."). The money was in the interstices of the bags of clothing they were taking with them.

As they were about to board their plane, representatives of the United States government asked them to declare any cash they carried in excess of $10,000. Ali Sher Kahn, the defendant, said he had only $12,800. A search of his bags revealed $293,266—all of it legally earned by himself or the friends for whom he was transporting it. There was no hint that the cash was to be used to fund terrorist activity or for any other illegal purpose. He was arrested, detained, tried criminally, and became a defendant in a civil forfeiture suit for the cash that the government had seized.

After a jury trial, defendant was convicted of cash smuggling (31 U.S.C. § 5332(a) and (b)), making false statements (18 U.S.C. § 1001(a)(2)) and conspiracy (18 U.S.C. § 371). His sentence was three years of supervised release, five months of home confinement, a special assessment of $300 and a fine of $7,500. (The civil forfeiture suit is still pending.) The court departed downward twelve levels because of (1) defendant's family circumstances and (2) the potential negative impact of a prison sentence on the workers in the businesses he operated.

### B. *Appeal*

Upon appeal by the United States from the downward departure—the government's view being that imprisonment of no less than forty-one months was required—

the Court of Appeals for the Second Circuit reversed and remanded for resentence. It wrote in an unpublished opinion:

[T]he district court erroneously granted a downward departure based on Ali Khan's family circumstances and on account of his business and employees.

.    .    .    .    .

### 1. Family Circumstances

While it is possible that exceptional family circumstances may exist here, the district court's departure was erroneous based on the current record. The record does not suggest that Ali Khan was the primary—let alone sole—support. The record similarly shows nothing as to how Ali Khan's incarceration would affect those individuals. Curiously, the expense portion of Ali Khan's monthly net cash flow statement, which he submitted prior to sentencing as part of his personal financial statement, omits any mention of funds that he sends to support his extended family.

### 2. Business and Employees

"[B]usiness ownership alone, or even ownership of a vulnerable small business, does not make downward departure appropriate"; but a "departure may be warranted where ... imprisonment would impose extraordinary hardship on employees." *United States v. Milikowsky,* 65 F.3d 4, 9 (2d Cir.1995). The *Milikowsky* Court upheld a downward departure based on extensive documentary and testimonial evidence demonstrating that the defendant was indispensable to his two companies and to the continuing employment of more than 150 individuals. *Id.* at 8–9.

It is possible, as the district court found, that Ali is "the main spring in the enterprise and that it will not succeed without him;" but the record does not support the district court's decision to depart on this basis. Even though Ali

maintains that "[h]e attends to the purchasing and every other detail" of the twelve-employee business, he testified also that one of his partners handles most of the paperwork. Ali concedes that the facts of his case are not as compelling as in *Milikowsky*. There is nothing in the record, other than Ali's self-serving and somewhat contradictory claims, indicating that Ali has unique skills essential to this enterprise, or that his two partners could not hire a new manager or do the work themselves.

\*    \*    \*    \*    \*    \*

The current record does not support either basis, family or business circumstances, on which the district court granted Ali Khan a downward departure. On remand, therefore, the court should conduct further fact-finding necessary to reassess whether a downward departure is appropriate and then should re-sentence Ali Khan consistent with this order and any additional findings that the court makes.

*United States v. Khan,* No. 03–1227, 94 Fed.Appx. 33, 38–40, 2004 WL 819097, at \*3–\*4 (2d Cir. Apr. 16, 2004) (summary order).

The Court of Appeals generously added that the order of remand "does not foreclose application of [USSG § 2S1.3(b)(2) (eff.Nov.1, 2001)], assuming appropriate showings and findings." *Id.* at 40. As indicated in Part V, *infra*, that provision of the Guidelines permits probation without a prison term.

### III. Defendant's Background

### A. *Personal*

The original presentence report and the original sentencing hearing revealed the following background:

Defendant, now thirty-five, was born in Swat, Pakistan. He is one of six children of the marital union of Bacht Zamal and

Mehina Bibi. Raised under lower-income economic conditions, he reported an uneventful childhood, free from drug, alcohol, and physical abuse. Because he could not read well enough to be promoted, defendant attended school only until the sixth grade.

His father died in 1998 of a heart attack at the age of fifty-six. His mother lives in Pakistan, is unemployed, and suffers from diabetes. She is supported by defendant and his brother.

Defendant has four living siblings. His one brother resides in the United States. He is John Sher, age thirty-four, living in Camden, New Jersey, with his wife and six children. He is in good health and is employed as a cook in a fast food restaurant. There are three sisters. All are housewives living in Pakistan: Begun Bibi is married with seven children; Maleeka Bibi is married with five children; and Shagoupta Bibi is married with four children. Defendant had another brother, Akbar Zada, who was beaten to death in Pakistan following a dispute over the use of water from a river; he is survived by his wife and six children, whom the defendant helps support.

Defendant's wife, Flora Drake, is healthy and is employed part-time in daycare, earning between $300 and $500 per week. The marriage—his only one—has not resulted in any children, although Mrs. Khan's son from a prior marriage, Lidel Drake, age twenty-one, resides with defendant. They live in a modest two bedroom, walk-up apartment. Lidel has two daughters, Monat, age six, and Aliza, age eighteen months, who live with their mother. Since Lidel is unemployed, defendant and his wife assist in supporting these children.

Until he was twenty-one, defendant resided in Pakistan. In 1990, he traveled to the United States by ship. He lived in Brooklyn for six months before moving to Middletown, New York, where he has since resided.

In 1992, defendant applied for political asylum because of the religious strife between the Shiites and Muslims in Pakistan; the status of that application is not known. Immigration and Naturalization Service records indicate that defendant is a lawful permanent resident of the United States.

Defendant reported no history of mental or emotional health problems or of gambling. In 1993 he injured his right knee playing soccer; surgery partially repaired the damage. He is otherwise healthy. Until his arrest, defendant smoked one or two marijuana cigarettes and drank two "shots" of brandy or cognac two or three times a week. He has never used any other narcotic.

B. *Financial*

Prior to 1990 defendant was a laborer on a farm or a railroad in Pakistan earning ten to fifteen rupees a day (equivalent to a few dollars). For a few months he was a deck hand on a ship based in Karachi, Pakistan, earning a total of $450 for this work. He quit to travel by boat to the United States.

For six months in 1990 defendant was a construction laborer in the Bronx. In 1991 he worked as a helper at a carpet store where he earned $225 (net) per week, "off-the-books." He lost this job when his employer left the area. From October 1991 to June 1992 he was a cook-trainee in a chicken fast food store in Newburgh, New York, where he earned $150 a week; from June 1992 to January 1996, defendant was a cook at $200 a week. He left to open his own restaurant in Camden, New Jersey.

Defendant is now partial owner and operator of three fried chicken fast food stores in Camden. He opened the first in

1996, investing with his friends, Maser Zafer and Liquat Ali; the defendant and Liquat Ali own seventy-five percent of the establishment, while Maser Zafer owns twenty-five percent. In 1998, the defendant, two cousins, and Liquat Ali opened a second fried chicken store in Camden. In 2001, the defendant, a cousin, and Liquat Ali opened a third fried chicken store in Camden. Each store is located in a lower-income commercial area. Each contains glass protecting employees from customers. All told they employ twelve workers in addition to the owners.

Defendant's filed income tax returns reflect the following:

| Tax Year | Adjusted Joint Gross Income | Taxable Income |
|---|---|---|
| 1997 | $ 17,047 | $ 2,197 |
| 1998 | $ 20,878 | $ 5,678 |
| 1999 | $ 25,912 | $ 10,462 |
| 2000 | $ 35,362 | $ 12,350 |
| 2001 | $ 47,619 | $ 22,146 |

His 2003 Personal Financial Statement reads:

*Net Worth*

(Omitting Good Will and Entrepreneurial Value)

| *Assets* | |
|---|---|
| Checking account No. 1 | $ 4,200 |
| Checking account No. 2 | 6,313 |
| Automobile No. 1 | 5,800 |
| Automobile No. 2 | 9,900 |
| Newswat Corporation | |
| Camden, NJ property No. 1 | 150,000 |
| Camden, NJ property No. 2 | 91,000 |
| Total Assets | $267,213 |
| Liabilities | $ 0 |
| Net Worth | $267,213 |

Obviously, coming to the United States has improved this defendant's economic and social condition appreciably. As indicated on his Personal Financial Statement, defendant now earns monthly $3,933 (net) for his own labor and $3,020 (net) in business income.

## IV. The Guidelines are not Dead

In *Blakely v. Washington,* — U.S. ——, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004), the Court found that enhancement of the length of a sentence under the Washington State guidelines based on judicial fact-finding required, under the Federal Constitution, that the "facts" must be found by a jury to be true beyond a reasonable doubt. The dissents suggested that the rulings might lead to the end of the Federal Sentencing Guidelines. *See id.* (dissenting opinions). Partly as a result of *Blakely,* a number of judges have declared the Guidelines dead. *See, e.g., United States v. Medas,* 323 F.Supp.2d 436, 2004 WL 1498183 (E.D.N.Y. July 1, 2004) (declining to submit a supplemental verdict sheet to jury for sentencing enhancement factors); *United States v. Croxford,* 324 F.Supp.2d 1230 (D.Utah 2004) (declining to apply Guidelines and reverting to pre-Guidelines procedure the sentence was much the same as it would have been under the Guidelines); *United States v. Maflahi,* No. 03–CR–412 (E.D.N.Y. June 9, 2004) (same); *United States v. Shamblin,* 323 F.Supp.2d 757, 766–67, 2004 WL 1468561, *8 (S.D.W.Va. June 30, 2004) (same); *United States v. Green,* 2004 WL 1381101 (D. Mass., June 18, 2004) (finding that Guidelines were unconstitutional before *Blakely,* based on the pre-*Blakely* decision in *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000) and *Ring v. Arizona,* 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002)); Alan Vinegrad & Jonathan Sack, Blakely: *The End of the Sentencing Guidelines,* N.Y.L.J., July 5, 2004, at 48 ("The entire federal guidelines scheme is on precarious constitutional grounds"). *See generally Sentencing Law and Policy,* at http://sentencing.typepad.com (July 12, 2004). *But cf. United States v. Booker,* 375 F.3d 508, 513, 514, 520–21 (7th Cir. 2004) (majority of court held the Guidelines constitutional except in cases "in which they limit defendant's right to a jury and to the reasonable doubt standard;" defendant had right to a jury to determine

the quantity of drugs he possessed; separate sentencing jury trial approved; dissent would severely limit effect of *Blakely* ).

The opinions of the learned judges finding the Guidelines unconstitutional are well reasoned and entitled to great respect. Many federal judges who believe the Guidelines unnecessarily cruel to defendants and their families, unduly expensive to the taxpayers who pay unnecessary billions for our bloated penitentiary system, and a violation of separation of powers under the Constitution would applaud the conversion of the mandatory restrictive Guidelines into discretionary guidelines in fact. But traditional deference · of the courts to extensive legislative and executive powers, as in *Mistretta v. United States*, brings to mind Mark Twain's response to his own premature obituary: "The reports of my death are greatly exaggerated." John Bartlett, Familiar Quotations 763a (14th ed.1968).

As indicated in Part V, *infra*, the jury's participation in sentencing has deep roots in this country's history and may be incorporated in the constitutional right to a jury trial. Experience with juries suggests that use of a jury in sentencing, even after a plea of guilty or in a second phase of a trial on the merits, is feasible. It is the mode in capital cases and, as even the dissent acknowledges, apparently works in Kansas. *See Blakely*, 124 S.Ct. 2531.

Most cases result in pleas, not trials. *Blakely* will, undoubtedly, result in many plea agreements, in which the defendant concedes the facts that *Blakely* requires to be proven by a jury. Defendants simply cannot resist the prosecutors' offers of guaranteed low punishments. In the few cases of a trial, after the guilty verdict, the special questions required for enhancement of sentence can be put to the jury as in capital cases. These issues will normally not be adjudicated at the main trial of guilt or innocence since they will likely prove unduly prejudicial.

The jury instruction need not be as complicated as those the government requested in *United States v. Medas*. 323 F.Supp.2d 436, 2004 WL 1498183. They should, unlike those in *Medas*, be requested before the trial with adequate notice given by indictment or letter. If the evidence to support them might be prejudicial on the main issue of guilt or innocence, they can be conveniently given to the same jury which determined guilt, in a second phase, with the opportunity to supply additional evidence and argument. This process works reasonably well in capital cases. *See* 28 U.S.C. § 848(g)-(*o*).

The Department of Justice on July 2, 2004 directed a communication to all prosecutors with respect to the government's position on *Blakely v. Washington. See* Memorandum *to* All Federal Prosecutors, *from* James Comey, Deputy Attorney General, *regarding* Departmental Positions and Policies in Light of *Blakely v. Washington* (July 2, 2004). Its basic position is that *Blakely* does not apply to the Federal Sentencing Guidelines:

> The position of the United States is that the rule announced in *Blakely* does not apply to the Federal Sentencing Guidelines, and that the Guidelines may continue to be constitutionally applied in their intended fashion, *i.e.,* through fact-finding by a judge under the preponderance of the evidence standard, at sentencing.

*Id.* at 1. This position seem plainly wrong and need not be discussed.

The fallback position stated in the communication is:

> [I]f *Blakely* applies, the constitutional aspects of the Guidelines cannot be severed from the unconstitutional ones. In that event, the court cannot constitutionally apply the Guidelines, but instead should impose a sentence, in its discretion, within the maximum and minimum

terms established by statute for the offense of conviction. In all such cases, the government should argue that, in the exercise of its discretion, the sentencing court should impose a sentence consistent with what should have been the Guidelines sentence.

There are three critical components of this position. **First,** the Guidelines remain constitutional and applicable if the Guidelines sentences can be calculated without the resolution of factual issues beyond the admitted facts or the jury verdict on the elements of the offense of conviction. Thus, in cases where a court, applying the Guidelines as they were intended, finds that there are no applicable upward adjustments under the Guidelines beyond the admitted facts or the jury verdict on the elements of the offense, the Guidelines are constitutional and should be applied. **Second,** in a case in which the defendant agrees to waive his rights to resolution of contested factual issues under the *Blakely* procedural requirements, the Guidelines should be applied. Thus, waivers of "*Blakely* rights" in connection with plea agreements and guilty pleas may be sought. **Third,** in a case in which there are applicable upward adjustments under the Guidelines, and the defendant desires to contest the underlying facts under the *Blakely* procedures, the Guidelines system as a whole cannot be constitutionally applied. In that event, the government should urge the court to impose sentence, exercising traditional judicial discretion, within the applicable statutory sentencing range. The government's sentencing recommendation in all such cases should be that the court exercise its discretion to impose a sentence that conforms to a sentence under the Guidelines (including justifiable upward departures), as determined with regard to *Blakely.*

*Id.* at 2 (emphasis in original).

The first point of the Department of Justice—the Guidelines should be applied if a factual issue left unresolved by jury verdict or admitted fact does not exist—is correct. The second point—that a defendant may waive or stipulate to avoid *Blakely*—also is correct. The third point—that when *Blakely* applies, traditional sentencing without Guidelines should be used—is a possible alternative. A second alternative is to apply the Guidelines without enhancement. A third alternative is to use a jury to decide the special enhancement facts. The trial judge should have discretion to use any of these alternatives, with the advice of counsel, since procedural difficulties in the individual case need to be weighed by the court in deciding whether use of a jury is practicable.

Unless *Blakely* is made retroactive—which seems highly unlikely in view of the chaos which would result—it is probable that this decision will have little impact on practice in federal district courts. *Cf. Coleman v. United States,* 329 F.3d 77, 90 (2d Cir.2003) (*Apprendi* is not retroactive). In most cases, the enhancing facts will be stipulated.

With that background of current issues, it is useful to turn to the history of juries and judges cooperating in sentencing in the United States.

### V. Jury and Court Cooperation in Sentencing

#### A. *Rationale of* Blakely

The rationale of the majority in *Blakely* is summed up in its paean to the jury:

Our commitment to *Apprendi* in this context reflects not just respect for longstanding precedent, but the need to give intelligible content to the right of jury

trial. That right is no mere procedural formality, but a fundamental reservation of power in our constitutional structure. Just as suffrage ensures the people's ultimate control in the legislative and executive branches, jury trial is meant to ensure their control in the judiciary. See Letter XV by the Federal Farmer (Jan. 18, 1788), reprinted in 2 The Complete Anti–Federalist 315, 320 (H. Storing ed.1981) (describing the jury as "secur[ing] to the people at large, their just and rightful controul in the judicial department"); John Adams, Diary Entry (Feb. 12, 1771), reprinted in 2 Works of John Adams 252, 253 (C. Adams ed. 1850) ("[T]he common people should have as complete a control . . . in every judgment of a court of judicature" as in the legislature); Letter from Thomas Jefferson to the Abbe Arnoux (July 19, 1789), reprinted in 15 Papers of Thomas Jefferson 282, 283 (J. Boyd ed. 1958) ("Were I called upon to decide whether the people had best be omitted in the Legislative or Judiciary · department, I would say it is better to leave them out of the Legislative"); *Jones v. United States*, 526 U.S. 227, 244–48, 119 S.Ct. 1215, 143 L.Ed.2d 311 (1999). *Apprendi* carries out this design by ensuring the judge's authority to sentence derives wholly from the Jury's verdict. Without that restriction, the jury would not exercise the control that the Framers intended.

*Blakely v. Washington,* 124 S.Ct. 2531, 2538–39 (2004).

### B. *Inherent Difficulty in Determining Original Meaning of Jury Trial*

The Constitution requires that we apply 1780 jury practice in our courts. Yet any attempt to fully understand and apply eighteenth-century rules for juries in twenty-first century federal sentencing is bound to · be somewhat chimerical. As in most endeavors to construe late eigh-

teenth-century legal practice as a guide to appropriate current procedures, the former background, applicable language, precedents and atmosphere is substantially incongruent with our own. We tend to adopt—because we generally have no real choice—unsophisticated political assumptions of nineteenth as well as twenty-first century historians, rather than focusing upon the actual functioning of the law and the courts in widely disparate times and circumstances.

In his magisterial volume, Felony and Misdemeanor, Julius Goebel, Jr., has noted the fundamental mendacity of the historical process applied to many forensic issues determining present rights. He wrote:

> Our profession . . . for some seven centuries has made a cult of its historical method. . . . In America, at least, this ritual has become a matter of mechanical gesture, bereft of all piety, pervaded with pettifoggery. For here this method to which jurists point with pride has been used for but mean tasks. It is the small and immediate issues of instant litigation which drive the practitioner to the past in a myopic search for ruling cases and precedents.

Julius Goebel, Jr., Felony and Misdemeanor: A Study in the History of Criminal Law at xxxiii (1976 ed.).

### C. *Discretion of Trial Court to Utilize Varying Procedures*

A wide variety of techniques is available to judges seeking to advise themselves in civil cases of relevant facts they must determine, ranging from testimony by eyewitnesses and experts to advisory juries. *Cf. City of New York v. Beretta U.S.A. Corp.,* 317 F.Supp.2d 193, 2004 WL 1050875 (E.D.N.Y.2004) (granting constitutional jury when advisory jury is appropriate); *N.A.A.C.P. v. Acusport, Inc.,* 271 F.Supp.2d 435 (E.D.N.Y.2003) (advisory

jury); *N.A.A.C.P. v. Acusport Corp.*, 226 F.Supp.2d 391 (E.D.N.Y.2002) (advisory jury); *Birnbaum v. United States*, 436 F.Supp. 967 (E.D.N.Y.1977) (same), *aff'd on this ground*, 588 F.2d 319 (2d Cir.1978).

Where there is no specific rule on a subject covered in the Federal Rules of Criminal Procedure, the civil rule or practice may be borrowed. Rule 57(b) of the Federal Rules of Criminal Procedure explicitly provides that when there is no controlling law, "a judge may regulate practice in any manner consistent with federal law...." *See also; Holmes v. United States*, 363 F.2d 281, 283 (D.C.Cir. 1966) (power stemming from common law; relying on Rule 42(b) of the Federal Rules of Civil Procedure to avoid prejudice in criminal trial); *United States v. Colombo*, 616 F.Supp. 780, 783 (E.D.N.Y.1985) (applying by analogy Rule 60(b) of the Federal Rules of Civil Procedure to criminal proceeding in reliance on Rule 57(b) of the Federal Rules of Criminal Procedure) Charles Alan Wright, Nancy J. King, Susan R. Klein, Federal Practice and Procedure, Federal Rules of Criminal Procedure, § 902.

Determining whether use today of a jury in criminal sentencing is consistent with our history—particularly that of the third quarter of the eighteenth century—is desirable for reasons of constitutional interpretation based on original meaning. Approach to the topic must begin with the humble acknowledgment that the founders, if they could at all understand our current bloated federal criminal law and the labyrinthian structure of the Guidelines, would be appalled or bemused.

### D. *Historical Discretion of Court*

In understanding the constitutionally-designed broad scope of judicial discretion to control practice, it is hard to do better than listen to Alexander Hamilton. Hamilton was a distinguished practicing lawyer. *See generally* Vols. I & II, The Law Practice of Alexander Hamilton (Julius Goebel, Jr., ed.1964); Alexander Hamilton, Prac-

tical Proceedings in the Supreme Court of the State of New York 88 (2004) ("The Proper Province of the Jury is to determin[e] Matters of Fact not of Law; but they may at their Peril determine both; and it often happens that the Law and Fact are so blanded that they cannot be separated.") He noted that "liberty can have nothing to fear from the judiciary alone.... The complete independence of the court of justice is peculiarly essential in a limited Constitution." The Federalist No. 78 (Alexander Hamilton). He went on to add, in words that could be applicable to the recent innovation of rigid federal guideline sentencing, that,

> [t]his independence of the judges is equally requisite to guard the Constitution and the rights of individuals from the effects of those ill humours, which the arts of designing men, or the influence of particular conjunctures, sometimes disseminate among the people themselves, and which though they speedily give place to better information, and more deliberate reflection, have a *tendency, in the meantime, to occasion dangerous innovations in the government, and serious oppressions. ....*"

*Id.* (emphasis added). Hamilton recognized that "the firmness of the judicial magistracy is of vast importance in mitigating ... severity...." *Id.*

The founders appreciated the desirability of having judges involve juries in criminal trials—as they were in 1789. *See* U.S. Const. art. III, § 2 ("The Trial of all Crimes ... shall be by jury."); *see also* U.S. Const. amend. VII (establishing trial by an impartial jury in civil cases). The jury as an "institution" was to "remain precisely in the same situation in which it is placed in State constitutions...." The Federalist No. 83 (Alexander Hamilton). Hamilton was referring in The Federalist to the criminal jury since the civil jury was not guaranteed until after the Constitution was adopted. Because of *Zenger* and other cases, the public was well aware of the importance of the jury in protecting human rights. *See, e.g.*, Morris D. Forkosch,

*Freedom of the Press; Croswell's Case*, 35 Fordham L.Rev. 415 (1965) (describing the Trial of Mr. John Peter Zenger, 17 Howell St (Tr. 675) (1735) and other cases).

Summarizing this earlier practice, with an analysis of the serious departures from traditional practice under current Guidelines, is the 2003 Address of Justice Anthony M. Kennedy to the American Bar Association. He is reported to have said: "Since the dawn of our republic and the creation of the federal court system, the role of sentencing has traditionally been at the discretion of the judiciary." Justice Anthony Kennedy, *Our resources are misspent, our punishments too severe, our sentences too long*, 51 The Fed. Lawyer 31, 31 (May 2004) (Marcia G. Shein, ed.). Contrasting the present situation, he is said to have declared, "No longer are judges able to address a defendant with knowledge that the sentence imposed will be a just one." *Id.* Supporting the Justice's reported critical views, footnotes have been added by the editor. *Id.* at 35–36; *see also Koon v. United States*, 518 U.S. 81, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996) (describing the traditional sentencing discretion of trial courts); Note, *The Unconstitutionality of Determinate Sentencing in Light of the Supreme Court's "Elements" Jurisprudence*, 117 Harv. L.Rev. 1236, 1259 (2004) ("Although discretionary sentencing may have produced inconsistency and indeterminacy, the procedural protections of the Constitution were not designed to create the most efficient criminal justice system possible. They were designed to ensure that each defendant receives adequate protection against arbitrary state encroachment on his liberty.... [D]espite all its perceived faults, discretionary sentencing achieved this protection. And, with all their perceived benefits, the Sentencing Guidelines do not.").

Professor Thomas Sargentick, writing about the historical foundation of separation of powers, noted the importance of the special function of the judiciary in protecting the respect and dignity due to those before it. He declared:

The great value of courts is that of fairness, the notion that litigants before them have a tribunal in which they can count on the fundamental norms of respect and dignity. The decision-making technique is one of judgment, based on normative and practical moral reasoning, and legal materials in order to achieve a result that is in accord with the law and applicable to the facts of a particular case.... But the argument for judicial independence necessarily rests, I think on the notion of difference—the notion that there are certain special values that are reflected in the court system and the judicial process.

Thomas Sargentick, Foundations of separation of powers, 87 Judicature 209, 212 (Mar.-Apr.2004).

### E. *Historical Discretion of Jury*

The fact that each of the states had distinctly different court systems and procedures complicates determining how the jury in criminal cases operated in colonial times. *See* The Federalist No. 83 (Alexander Hamilton). New York, where Hamilton practiced, somewhat followed these British procedures. Ron Chernow, Alexander Hamilton 168 (2004). As the colonies were turning into states, moreover, nineteenth-century trial by jury was in process of substantial change.

What tended to replace the eighteenth-century jury trial more and more was the guilty plea. This trend began fairly early in the nineteenth century and snowballed. By 1900, in New York County, there were more than three times as many convictions in felony cases because of guilty pleas than there were convictions by judge or by jury. *See* Lawrence M. Friedman, Crime and Punishment in American History 251

(1993); *see also United States v. Speedy Joyeros, S.A.,* 204 F.Supp.2d 412, 417 (E.D.N.Y.2002) (less than five percent of criminal cases are tried, giving the prosecutor enormous leverage in fixing sentence under federal guidelines).

Earlier, the discretionary function in sentencing was shared by judge and jury. John H. Langbein concluded:

> The sentencing practices of the later seventeenth and eighteenth centuries were a powerful source of pressure on the defendant to speak at his trial. Our modern expectation is that sentencing will occur in a separate post-verdict phase, after the trial has determined guilt. Furthermore, in jury-tried cases, we expect the judge, not the jury, to exercise whatever sentencing discretion the law might bestow. In early modern times, however, these divisions of function in sentencing matters between trial and post-trial, and between jury and judge, were less distinct.

John H. Langbein, The Origins of Adversary Criminal Trial 57 (2003); *see also id.* at 59 (describing "jury's power to mitigate sanctions"); Barbara Wootton, Crime and Penal Policy 35 (1978) (changing views of the balance between justice and fairness); J.M. Beattie, Crime and the Courts in England, 1660–1800 at 406 (1986) (describing changing relationship of judge and jury and power of jury to affect punishment); Peter Graham Fish, Federal Justice in the Mid–Atlantic South 30–32, 212 (undated) (conflict between jury and judge control and differences between state and developing federal practice). Juries decided questions of law and fact in criminal and civil cases. *See, e.g.,* William E. Nelson, *Americanization of the Common Law, The Impact of Legal Change on Massachusetts Society,* 1760–1830, 257 n. 37 (1994). As Professor Larry D. Kramer put the matter in *The People Themselves, Popular Consti-*

*tutionalism and Judicial Review,* 28–29 (2004):

> [L]awyers argued fundamental law to juries, which rendered verdicts based on their own interpretation and understanding of the constitution. This was consistent with the broad power of the eighteenth-century jury to find law as well as fact and to decide every aspect of a case. Judges might instruct juries, but it was, in the words of John Adams, "not only [every juror's] right but his Duty in that Case to find the Verdict according to his own best Understanding, Judgment and Conscience, tho in Direct opposition to the Direction of the Court." Placing juries in this dominant position, Adams explained, introduced a "mixture of popular power" into the execution of the law and was thus an important protection of liberty. This was particularly true when it came to fundamental law, for the jury was "the Voice of the People."

(Footnotes and quotations omitted); *see also, e.g.,* James R. Stoner, Jr., Common–Law Liberty, Rethinking American Constitutionalism 94–96 (2003).

The authors known to the founders had a high respect for the wide powers of the jury over law, fact and punishment. *See, e.g.,* James R. Stoner, Jr., Common Law and Liberal Theory: Coke, Hobbes and the Origins of American Constitutionalism at 110 (Hobbes), 156 (Montesquieu), 210 (Hamilton) (1992); Paul O. Carrese, The Cloaking of Power: Montesquieu, Blackstone and the Rise of Judicial Activism at 5 ("More leading politicians studied and cited Montesquieu in America's founding era than read Rawls today ...."), 16 ("jury centered power"), 49 ("Juries are, for Montesquieu a kind of cloaking device ... judges will imperceptibly mitigate the severity of the law. A cloaking power quietly reforms the ... severe moral stan-

dards...."), 128 (Blackstone recognized that "the jury indeed was a point of pride for English common law...."), 170 (Blackstone's reliance on "that central institution of the common law, trial by jury") (2003); 4 William Blackstone, Commentaries 378 (St. George Tucker Am. ed. 1803) (describing the jury as the "glory of the English law," in civil and even more so in criminal cases).

In a sense, the jury was, and remains, the direct voice of the sovereign, in a collaborative effort with the judge. It expresses the view of a sometimes compassionate free people faced with an individual miscreant in all of his or her tainted humanity, as opposed to the abstract cruelties of a more theoretical and doctrinaire distant representative government. *Cf.* Gary Wills, *Lessons of a Master*, N.Y. Rev., June 24, 2004, at 12, 14 (reviewing Edmund S. Morgan, The Genuine Article: A Historian Looks at Early America (2004)) (discussing representative versus democratic government in the United States).

In the last quarter of the eighteenth century, juries were also changing. Instead of partial fact providers, they were becoming controlled fact finders, limited to knowledge acquired in the courtroom. *See, e.g.,* Langbein, *supra,* at 320–21.

The complexity of the late colonial practice and the relationship of judge and jury can perhaps best be gleaned from Julius Goebel, Jr. and T. Raymond Naughton, Law Enforcement in Colonial New York, A Study in Criminal Procedure (1664–1776) (1970). For our present purposes, it is enough to say that the practice in the various colonies was a combination of actual practice as revealed in court files, local legislation and procedures adopted from that of the British in local and central courts. *See id.* at xvii-xix, xxiii, xxvii, xxix, 144–45. The importance of "trial by the vicinage" to obtain local knowledge and

sentiments was recognized. *Id.* at 603–05. "[O]n some occasions [in the late colonial period] matters were left to the jury which in England would have been the province of the court...." *Id.* at 629. Mitigation by jury was recognized. *Id.* at 675. There was "the feeling in Revolutionary times that of all incidents of criminal justice trial by jury should remain inviolate." *Id.* at 679. Discretion of the magistrate in sentencing was broad. *Id.* at 682–83, 686, 703 n. 189, 707, 710 & 748. Clemency was widespread. *Id.* at 749, 756. The jury could exercise its charity. *Id.* at 751.

James Madison's fear of majoritarian abuse, particularly by the legislature, and of the lack of power and will of judges to protect minorities against maltreatment was partly ameliorated by the jury. "When the people are the sovereign and, one way or another, are the source of all the branches' power, an agency of government that attempts to mete out justice against the will of the people does so at its peril." James S. Liebman & Brandon L. Garrett, *Madisonian Equal Protection,* 104 Colum. L.Rev. 837, 935 (2004) (paraphrasing Madison). "Because judges with a 'will' sufficiently 'independent of the people' to dispose them to resist majority oppression had to be appointed and life-tenured, they inevitably 'are too far removed from the people to share much of their prepossessions' and to partake of their trust." *Id.* at 936 (quoting Madison). "However strongly *disposed* judges may otherwise be to counter majority injustices, their lack of popular support deprives them of their *power* and thus the courage to do so." *Id.* at 936 (emphasis in original); *see also United States v. Chevere,* 368 F.3d 120, 121 (2d Cir.2004) ("The jury speaks for the community ....") (quoting *United States v. Gilliam,* 994 F.2d 97, 100–01 (2d Cir.1993)).

Our modern cases recognize that the jury's influence in sentencing dates back to eighteenth-century English courts, where juries were able to reduce sentences by convicting on lesser charges carrying lesser penalties. *See Jones v. United States,* 526 U.S. 227, 245, 119 S.Ct. 1215, 143 L.Ed.2d 311 (1999) ("The potential or inevitable severity of sentences was indirectly checked by juries' assertions of a mitigating power when the circumstances of a prosecution pointed to political abuse of the criminal process or endowed a criminal conviction with particularly sanguinary consequences."); *see also* Langbein, *supra,* at 57–58. This "pious perjury," as it was called, was used most commonly to defeat attempts to impose the death penalty. *Id.* (citing 4 Blackstone, *Commentaries* 239). Juries exercised this discretion in nearly twenty-five percent of "a sample of London cases from the Old Bailey in the 1750's." *Id.* The subtle machinations of the ancient English juries call to mind the contemporary prosecutor's power to influence sentencing through the charges sought. *See, e.g., Harris v. United States,* 536 U.S. 545, 571, 122 S.Ct. 2406, 153 L.Ed.2d 524 (2002) (Breyer, J., concurring) ("[Mandatory minimums] transfer sentencing power to prosecutors, who can determine sentences through the charges they decide to bring...."); *Lewis v. United States,* 518 U.S. 322, 336, 116 S.Ct. 2163, 135 L.Ed.2d 590 (1996) ("Prosecutors have broad discretion in framing charges."). These maneuvers do not constitute formal sentencing authority, but they are inseparable from sentencing practice.

### F. Legislatively Recognized Jury Sentencing Power

The legislators of colonial America granted juries sentencing power, recognizing the widespread common law practice. *See, e.g.,* Jenia Iontcheva, *Jury Sentencing as Democratic Practice,* 89 Va. L.Rev. 311, 316 (2003). Virginia was apparently the first state to legislatively recognize that jury sentencing existed. *See* Act of Dec. 22, 1796, § 15, 1796 Va. Acts ch. 2. In 1919, fourteen states still utilized jury sentencing in noncapital cases. *See* Iontcheva, *supra,* at 318.

### G. Modern Decreased Use of Juries

The English and post-colonial states' trust in jury sentencing stands in marked contrast to the practice in today's federal courts; now appellate courts are disturbed by the thought of jurors catching a whiff of the sentencing implications in their deliberations. *See, e.g., Aliwoli v. Carter,* 225 F.3d 826, 829 (7th Cir.2000) ("Since the jury only determines whether the defendant is guilty or not guilty, 'providing jurors sentencing information invites them to ponder matters that are not within their province, distracts them from their fact-finding responsibilities, and creates a strong possibility of confusion.' ") (citations omitted).

By the mid-twentieth century, jury sentencing was becoming the exception. *Cf. McMillan v. Pennsylvania,* 477 U.S. 79, 93, 106 S.Ct. 2411, 91 L.Ed.2d 67 (1986) ("[T]here is no Sixth Amendment right to a jury sentencing, even where the sentence turns on specific findings of fact."). It is said that only six states specifically, currently allow jury sentencing in noncapital cases. *See* Iontcheva, *supra,* at 318.

Jury participation in sentencing still has substantial support. *See, e.g.,* Fernand N. Dutile, *Jury Consideration of Parole,* 18 Cath. U. Am. L.Rev. 308 (1968); Morris B. Hoffman, *The Case for Jury Sentencing,* 52 Duke L.J. 951 (2003); Jenia Iontcheva, *Jury Sentencing as Democratic Practice,* 89 Va. L.Rev. 311 (2003); Adriaan Lanni, Note, *Jury Sentencing in Noncapital Cases: An Idea Whose Time Has Come (Again)?,* 108 Yale L.J. 1775 (1999). *Cf. United States v. Greenpeace,* 314 F.Supp.2d 1252 (S.D.Fla.2004) (noting that

jury trial is in court's discretion and discussing historical precedent). Nancy J. King, *Lessons from the Past: The Origins of Felony Jury Sentencing in the United States*, 78 Chi.-Kent. L.Rev. 937 (2003); Note, *Jury Sentencing in Virginia*, 53 Va. L.Rev. 968 (1967) (listing thirteen states which provide for sentencing in non-jury cases); Note, *Practice and Potential of the Advisory Jury*, 100 Harv. L.Rev. 1363 (1987). Moreover, juror departures—when they seek to nullify the law in order to humanize it—are far from universally frowned upon. *See, e.g.,* Kaimipono David Wenger & David A. Hoffman, *Nullificatory Juries*, 2003 Wis. L.Rev. 1115 (extensive authorities cited).

### H. *Summary*

No suggestion is made that a late colonial court would have used an advisory jury or a post-guilt finding jury trial in determining a guidelines sentence. Such sentences were unknown. Nonetheless, the practice cannot be said to be out of character for a colonial judge faced with the kind of sentencing dilemmas a federal judge now confronts under the Guidelines. It is not aberrational to suggest that use of a jury on sentencing issues of fact—and perhaps on severity—is consistent with history, practice and the inherent role of federal courts and juries.

Reliance on the jury represents a reflection of our government's dependence on the ultimate and residual sovereignty of the people. That foundation for all power—executive, legislative and judicial—is reflected in the preamble to the Constitution beginning, "We the People ... do ordain and establish this Constitution." *See also, e.g.,* U.S. Const. amend. IX (reserved rights); Declaration of Independence ("Governments ... depriving their just Powers from the Consent of the Governed."); James Madison, *Essay on Sover-*

*eignty* (1835) (equating "the supreme power" to "the sovereignty of the people").

### I. *Waiver by Parties*

In this case the parties have not requested that the court use an advisory jury because one is not necessary to protect the defendant and the public. *See* Part V, *infra.* Under the approach described below, the non-custodial sentence does not require jurors' factual findings supporting grounds for departure. Counsel for both the Government and defendant now concede this is the case. Accordingly, an advisory jury will not be empaneled in this case.

### VI. Sentencing Under Guidelines Section 2S1.3(b)(2)

### A. *Applicable Guideline and Supporting Facts*

Subsection 2S.1.3(b)(2) of the United States Sentencing Guidelines, effective November 1, 2001, states in part with respect to defendant's crimes:

> If (A) [not applicable] ... (B) the defendant did not act with reckless disregard of the source of the funds; (C) the funds were the proceeds of lawful activity; and (D) the funds were to be used for a lawful purpose, decrease the offense level to level 6.

The court finds the requisite elements (B), (C) and (D) as a matter of fact. First, there has been no showing that defendant "knew or believed that the funds were proceeds of unlawful activity, or were intended to promote unlawful activity." The defendant did not act with "reckless disregard of the source of the funds." The funds were shown to be proceeds of defendant's business operations or the labor of his friends. Defendant has no prior criminal history suggesting that the funds were gained through illicit activity. *See, e.g., United States v. $49,766.29 U.S. Currency,*

2003 WL 21383277, *5 (W.D.N.Y. Jan.22, 2003) (USSG 2S1.3(b)(2)). Finally, the money was intended for use as lawful financial assistance for defendant's family in Pakistan and for those of his friends.

Level 6 of the Guidelines permits a term of probation. Given the defendant's background and responsibilities to his own and other families and business associates, a prison sentence is not appropriate.

### B. *Conspiracy*

■ There are occasions when a conspiracy may provide a greater threat to society than the crime itself since many dangerous individuals combining may be of more concern than one defendant. *See* American Law Institute, Model Penal Code & Commentaries, Part 1, § 5.03 (1985) ("special danger incident to group activity"); Herbert Wechsler, Kenneth Jones and Harold Korn, *The Treatment of Inchoate Crimes in the Model Penal Code of the American Law Institute: Attempt, Solicitation and Conspiracy,* 61 Colum. L.Rev. 571, 957–1017 (1961). Nevertheless, the Guidelines provide in general for reduced penalties for a conspiracy that does not succeed. *See* U.S.S.G. § 2X1.1. Here, although defendant was convicted of conspiracy, the court finds there was, for purposes of sentencing, no conspiracy. Defendant and his friends engaged in parallel conduct, not a conspiracy, even though a jury was authorized to find a conspiracy. These were not dangerous collaborators in crime, but individuals trying to do a good turn to their former countrymen and relatives. There is no reason to treat this defendant as a dangerous conspiring gang member.

### C. *Non-application of the Feeney Amendment*

The Prosecutorial Remedies and Other Tools to end the Exploitation of Children Today Act of 2003 ("PROTECT Act"), passed by Congress in April of 2003, included a much-criticized provision commonly referred to as the Feeney Amendment. Pub.L. No. 108–21, 117 Stat. 650 (2003). *See, e.g.,* David M. Zlotnick, *The War Within the War on Crime: The Congressional Assault on Judicial Sentencing Discretion,* 57 S.M.U. L.Rev. 211, 229–37 (2004) (criticizing Feeney Amendment in text accompanying notes 121–162); Michael Brennan, *A Case for Discretion: Are Mandatory Minimums Destroying Our Sense of Justice and Compassion,* Newsweek, Nov. 13, 1995, at 18; Chief Justice Attacks a Law on Infringing on Judges, N.Y. Times, Jan. 1, 2004 at A14; Carl Hulse, *Bill to Create Alert System on Abduction is Approved,* N.Y. Times, Apr. 10, 2003 at A1 (quoting letter from Chief Judge Rehnquist to Senate Judiciary Committee stating that the Feeney Amendment "would do serious harm to the basic structure of the sentencing guideline system and would seriously impair the ability of courts to impose just and reasonable sentences").

The Feeney Amendment, among other unsound innovations, prohibits a downward departure unless the ground for departure was relied upon in the previous sentencing and approved by the court of appeals. *See* 18 U.S.C. § 3742(g)(2). Section 3742 of title 18 of the United States Code now provides:

(g) Sentencing upon remand.—A district court to which a case is remanded ... shall resentence a defendant in accordance with section 3553 and with such instructions as may have been given by the court of appeals, except that—

(1) In determining the range ... the court shall apply the guidelines ... that were in effect on the date of the previous sentencing of the defendant prior to the appeal ...; and

(2) The court shall not impose a sentence outside the applicable guidelines range except upon a ground that—

(A) *was specifically and affirmatively included in the written statement of reasons ... in connection with the previous sentencing of the defendant prior to the appeal; and*

(B) *was held by the court of appeals, in remanding the case, to be a permissible ground of departure.*

(emphasis added).

The new sentence in the instant case is in accordance with a suggestion by the Court of Appeals for the Second Circuit to consider sentencing under subsection 2S1.3(b)(2) of the Guidelines. See Part II.B, *supra.* That court did not "foreclose application of this provision, assuming appropriate showings and findings." *United States v. Khan,* No. 03–1227, 94 Fed.Appx. 33, 39, 2004 WL 819097, *4 (2d Cir. April 16, 2004) (summary order).

■ The new sentence after remand is not outside the "applicable guidelines range" imposed by subsection 2S1.3(b)(2) of the guidelines. 18 U.S.C. § 3742(g)(2). The range dictated by subsection 2S1.3(b)(2) includes a term of probation to up to six months imprisonment. *See* U.S.S.G., Sentencing Table (eff. Nov.1, 2001). Where an independent section of the guidelines not relied upon at the time of the original sentence operates to reduce the new sentence without a downward departure, the Feeney Amendment is not applicable.

In light of this decision, it is not necessary to consider whether this and other guidelines changes have by now so interfered with appropriate judicial discretion under Article III of the Constitution as to be unconstitutional. *See, e.g.,* Zlotnick, *supra,* at 235; Part IV, *supra.*

The range associated with subsection 2S1.3(b)(2) is the "applicable guidelines range" for purposes of subsection 3742(g)(2). A sentence within that range

is not precluded by the Feeney Amendment.

## VII.   Conclusion

Defendant is sentenced to five years probation, a $300 special assessment and a fine of $7,500.

This is the sentence the court would have imposed under its general powers were the Guidelines unconstitutional.

SO ORDERED.